Tom Wheeler, CA Bar #304191
Environmental Protection Information Center
145 G Street #A
Arcata, California 95521
tom@wildcalifornia.org
Ph: (707) 822-7711
Fax: (707) 822-7712

LOCAL COUNSEL

Susan Jane M. Brown (OSB #05460), *Pro Hac Vice Application Pending*
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
Ph. 503-914-1323
brown@westernlaw.org

LEAD COUNSEL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, ENVIRONMENTAL PROTECTION INFORMATION CENTER, and KLAMATH FOREST ALLIANCE,<br><br>Plaintiffs,<br><br>vs.<br><br>PATRICIA A. GRANTHAM, Klamath National Forest Supervisor, and UNITED STATES FOREST SERVICE,<br><br>Defendants. | Civ. Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

PAGE 1 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. This is a civil action against Patricia Grantham, Supervisor of the Klamath National Forest, and the United States Forest Service ("Forest Service") of the United States Department of Agriculture. Plaintiffs allege Ms. Grantham and the Forest Service violated the National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act when they issued a Decision Notice and Finding of No Significant Impact approving the Seiad-Horse Risk Reduction Project ("Seiad-Horse Project") on the Klamath National Forest.

2. The name of the Project challenged by Plaintiffs in this action is a misnomer.

3. In recent years, California and other western states – indeed, geographies across the globe – have experienced an increase in the magnitude of disturbance events, including wildfires.

4. The "causes" of the increase in wildfires are complex and include global climate change and past forest management.

5. In particular, how forests are managed after wildfire can dictate how forests function in the future: the best available science indicates that future wildfires are made worse by extensive logging that removes all of the largest fire-affected trees from an area ("clear cut logging").

6. While the Forest Service proposes to retain some trees after logging, these trees are generally located in non-harvest areas outside of logging units.

7. Despite this science, the Forest Service – as it has done in this case – often characterizes efforts to conduct post-fire logging as restorative in nature, offering a false promise that undertaking post-fire logging will reduce the risk of future wildfire events.

8. Instead of reducing the risk of future wildfire, the Project threatens the ecological integrity of watersheds that were burned by the 2017 Abney fire that are already beginning to recover from this disturbance.

9. The Seiad-Horse Project proposes more than 1,100 acres of logging in a number of ecologically important areas including the Kangaroo Inventoried Roadless Area, the Cook and Green Botanical Area, the Pacific Crest Trail, an Essential Habitat Connectivity Area, and Riparian Reserves along waterways.

PAGE 2 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

10. The entire Project is located within the Johnny O'Neil Late-Successional Old Growth Forest Reserve, which is a land use allocation set aside for the development of old growth forest conditions. Snags, standing dead trees, are an important component of old growth forests.

11. In its environmental analysis for the Project, the Forest Service admitted that post-fire clear-cut logging will result in degraded terrestrial and aquatic habitat conditions, increased sedimentation of water quality limited streams, and decreased landscape connectivity. Consequently, the Project is "likely to adversely affect" the Threatened northern spotted owl and Threatened coho salmon.

12. In the wake of the 2017 Abney Fire, the Forest Service had an opportunity to focus on true landscape restoration by removing small trees and brush from the forest and creating defensible space on federal lands adjacent to private property. While the Project includes a small amount of this work, which Plaintiffs do not challenge, the agency has proposed to couple this common-sense forest management with clear-cut logging of old forests affected by wildfire. Because clear-cut post-fire logging will increase the future risk of wildfire and compromise ecological integrity of the recovering forest, Plaintiffs seek judicial review of the Forest Service's Project.

## JURISDICTION

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Federal defendants' environmental assessment ("EA") and decision notice and finding of no significant impact ("DN/FONSI") comprise final agency actions subject to judicial review under the Administrative Procedure Act ("APA").

14. This Court may issue declaratory relief pursuant to 28 U.S.C. § 2202.

15. This Court may issue injunctive relief pursuant to 28 U.S.C. § 2201, 5 U.S.C. § 702, and 5 U.S.C. § 706.

16. An actual, justiciable controversy exists between plaintiffs and federal defendants.

## INTRADISTRICT ASSIGNMENT

17. Venue in this court is proper under 28 U.S.C § 1391(1)(b).

1   18.     The lands at issue in this dispute are located in Siskiyou County, California, and the final
2   agency action challenged in this action took place in Siskiyou County, California.  Pursuant to
3   Local Rule 120(d), intradistrict assignment to Sacramento, California is appropriate.

**PARTIES**

19.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main offices are in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath region. KS Wild is a leader in protecting California's national forests and routinely participates in commenting, monitoring, and litigation affecting public lands in California. KS Wild is a membership organization and has members who would be irreparably injured by the Seiad-Horse Project.

20.     Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER ("EPIC") is a nonprofit public benefit corporation organized under the laws of California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath Mountains and North Coast Range. EPIC's mission is the science-based protection and restoration of northwest California's forests and seeks to ensure that a connected landscape exists for species survival and climate adaption. EPIC's advocacy utilizes community organizing, public education, collaboration, and litigation and submits substantive comments on projects that would negatively impact public and private forestlands. EPIC maintains an office in Arcata, California. Most of EPIC's 15,000 members and supporters live in northern California. EPIC's members and staff use, enjoy, and recreate on public lands and Wild and Scenic Rivers, including those within the project area on the Klamath National Forest, and would be irreparably injured by the Seiad-Horse Project.

21.     Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is a non-profit community organization founded in 1989, based in Orleans, California. Its mission is to promote sustainable ecosystems and sustainable communities of the Klamath-Siskiyou Mountain region. KFA participates in forest planning through agency engagement, substantive comments and collaboration and uses law, science, place-based knowledge and conservation advocacy to defend the biodiversity, wildlife, waters and mature forests of the Klamath-Siskiyou bioregion.

22.     Defendant PATRICIA GRANTHAM is the Forest Supervisor for the Klamath National Forest. Ms. Grantham is sued in her official capacity. Ms. Grantham signed the Seiad-Horse Project DN/FONSI.

23.     Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the U.S. Department of Agriculture. The Forest Service manages the Klamath National Forest.

## SUMMARY OF LAW AND FACTS

**Administrative Procedure Act**

24.     The Administrative Procedure Act ("APA") confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions...found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**National Forest Management Act**

25.     The National Forest Management Act ("NFMA") requires the Forest Service to develop comprehensive land and resource management plans ("LRMPs") for each unit of the National Forest System. 16 U.S.C. § 1604(a).

26.     Subsequent "plans, permits, contracts, and other instruments for the use and occupancy" of the national forests must be consistent with the local LRMP, in this case, the Klamath National Forest Land and Resource Management Plan, as amended. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

///     ///     ///
///     ///     ///
///     ///     ///

**National Environmental Policy Act**

27. Congress enacted the National Environmental Policy Act ("NEPA") in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

28. NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action.

29. The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 et seq.

30. NEPA requires the agencies to prepare an Environmental Impact Statement ("EIS") when a major federal action is proposed that *may* significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1501.4(a)(1).

31. An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1.

32. In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27.

33. In evaluating intensity, federal defendants must consider numerous "significance" factors including impacts that may be both beneficial and adverse; the degree to which the proposed action affects public health or safety; unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to

PAGE 6 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1) – (b)(10).

**The Northwest Forest Plan**

34.     In 1994, the Bureau of Land Management and the United States Forest Service issued a Record of Decision for the Northwest Forest Plan ("NFP"), which established management requirements for all Forest Service land within the range of the northern spotted owl and amended all National Forest LRMPs within the range of the owl, including the Klamath National Forest LRMP.

*Late-Successional Reserves*

35.     Late-Successional Reserves ("LSRs") are land use allocations under the NFP where the primary objective is to protect and enhance the conditions of old-growth forests that serve as habitat for the northern spotted owl and other late-successional habitat-associated species by creating a network of large "reserves" or blocks of habitat.

36.     The NFP requires the Forest Service to manage LSRs to "protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species."

37.     The lands affected by the Seiad-Horse Project lie entirely within the Johnny O'Neil Late-Successional Reserve.

38.     The NFP permits logging in LSRs but restricts the timing, location, type, and amount of salvage logging that may occur.

39.     First, the NFP requires salvage logging within LSRs to be consistent with LSR Objectives, including the "development of old-growth forest characteristics including snags."

PAGE 7 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40. Snags are standing dead trees.

41. The Seiad-Horse Project will remove snags, critical old-growth forest features, from the planning area: "generally, for species associated with snags, the Project would reduce the number of snags in the short term."

42. Second, the NFP states that within LSRs, "while priority should be given to salvage in areas where it will have a positive effect on late-successional forest habitat, salvage operations should not diminish habitat suitability now or in the future."

43. The Seiad-Horse Project environmental assessment acknowledges that habitat suitability for many late-successional associated species will decline immediately after project implementation as well as into the future.

44. Third, the NFP states that following stand replacing events such as wildfire, the Forest Service must "focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags."

45. Scientific literature indicates that snags greater than 16" dbh are likely to persist on the landscape until the new forest is again producing snags, in about 80 years.

46. The average diameter of snags to be logged along roads in the Seiad-Horse project and in risk reduction salvage units is in excess of 16" DBH.

*Aquatic Conservation Strategy*

47. The Aquatic Conservation Strategy ("ACS") of the NFP was developed to restore and maintain the ecological health of watersheds and aquatic ecosystems contained within them, and to protect salmon and steelhead habitat on federal lands.

48. The ACS accomplishes its goals through mandatory compliance with nine Aquatic Conservation Strategy Objectives ("ACSOs").

49. The nine ACSOs are: (1) Maintain and restore the distribution, diversity, and complexity of watershed and landscape-scale features to ensure protection of the aquatic systems to which species, populations, and communities are uniquely adapted; (2) Maintain and restore spatial and temporal connectivity within and between watersheds. Lateral, longitudinal, and drainage network connections include floodplains, wetlands, upslope areas, headwater tributaries, and

intact refugia. These network connections must provide chemically and physically unobstructed routes to areas critical for fulfilling life history requirements of aquatic and riparian-dependent species; (3) Maintain and restore the physical integrity of the aquatic system, including shorelines, banks, and bottom configurations; (4) Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems. Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction, and migration of individuals composing aquatic and riparian communities; (5) Maintain and restore the sediment regime under which aquatic ecosystems evolved. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport; (6) Maintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of sediment, nutrient, and wood routing. The timing, magnitude, duration, and spatial distribution of peak, high, and low flows must be protected; (7) Maintain and restore the timing, variability, and duration of floodplain inundation and water table elevation in meadows and wetlands; (8) Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands to provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration and to supply amounts and distributions of coarse woody debris sufficient to sustain physical complexity and stability; and (9) Maintain and restore habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species.

50.    In order to make the finding that a project or management action "meets" or "does not prevent attainment" of the ACS objectives, project-level analysis must include a description of the existing condition, a description of the range of natural variability of the important physical and biological components of a given watershed, and how the proposed project or management action maintains the existing condition or moves it within the range of natural variability.

51.    "Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not "meet" the intent of the ACS and thus, should not be implemented."

PAGE 9 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

52. The NFP also states "Do not use mitigation or planned restoration as a substitute for preventing habitat degradation."

53. Riparian Reserves are a land allocation under the NFP covering "portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply."

54. Riparian Reserves generally parallel "standing and flowing water, intermittent stream channels and ephemeral ponds, and wetlands," and "also include other areas necessary for maintaining hydrologic, geomorphic, and ecologic processes" such as geologically "unstable and potentially unstable" areas.

**The 2017 Abney Fire**

55. The 2017, Abney Fire started on the Rogue River-Siskiyou National Forest in Oregon, but eventually spread to the Klamath National Forest in California.

56. The Abney Fire burned approximately 10,800 acres on the Klamath National Forest; about half of the acres burned at high severity, and half burned at low severity.

57. Natural forest regeneration is occurring in the project area, including conifer seedlings and hardwood stump sprouting, even in areas that burned at high severity.

**The Seiad-Horse Planning Area**

58. The Seiad-Horse planning area has been heavily impacted by past management: approximately 75% of the planning area has "had some level of past management, including complete to partial removal of the overstory from clear cut, salvage, group selection, or individual selection harvest. All harvested area had subsequent site preparation, tree planting, tree release, and pre-commercial thin treatments."

59. Due in large part to the extensive and intensive management history, "all streams in the project area are listed as impaired under section 303(d) of the Clean Water Act, which means that current conditions do not meet water quality standards and streams are not supporting their beneficial uses (USEPA 2010). The 303(d) list identified stream temperature and sediment as the pollutants causing impairment. One cause of impairment on National Forest System lands

Case 2:18-cv-02785-TLN-DMC   Document 1   Filed 10/16/18   Page 11 of 20

has been attributed to legacy sediment sites from past management including historic mining, road building, and silviculture."

60. Despite this extensive and intensive management history, the project area still contains important areas that are relatively untouched, including two Inventoried Roadless Areas: the Condrey Mountain and Kangaroo Roadless Areas. The Seiad-Horse Project will conduct roadside hazard tree logging along two miles of an existing road within the Kangaroo Roadless Area.

61. The Pacific Crest Trail traverses the project area, and logging activities will take place around and be visible from the Trail.

62. In 2010, the State of California prepared a statewide Essential Habitat Connectivity Map, "which is a coarse scale map depicting the blocks of habitat important for maintaining connectivity over a large area...The Seiad-Horse Risk Reduction Project area contains portions of the identified Essential Habitat Connectivity area."

63. In addition, researchers have "found the project area important in contributing to large scale wildlife connectivity."

64. In analyzing how the proposed project will affect wildlife connectivity, the Forest Service used "habitat connectivity for the fisher, marten, and wolverine as analysis indicators because these species, and the resulting analysis, are more sensitive to the possible effects resulting from the proposed actions."

65. The connectivity analysis concludes that the project will "result in a small increase in the average size openings" that will "change the habitat connectivity level from moderate to low in the short-term," and will impede wildlife movement across the project area.

66. There are two designated Botanical Areas in the project area: The Cook and Green, and Baker Cypress Botanical Areas.

67. The Cook and Green Botanical Area "is considered to be the dividing line between the eastern and western Siskiyou Mountain Range" and "has a phenomenal concentration of native plant species, one of the richest areas in California, with possibly as many as 300 species

PAGE 11 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

present." The Seiad-Horse Project proposes roadside hazard tree logging and yarding within this Botanical Area.

68. The Baker Cypress Botanical Area "contains a stand of rare Baker Cypress" that is likely the healthiest stand of Baker Cypress on the Forest.

69. The planning area is home to the Threatened northern spotted owl and its designated critical habitat, and "may affect, likely to adversely affect" this species.

70. As a result of project implementation, northern spotted owl (NSO) "habitat would be impacted in the short-term...Since roadside hazard tree removal is based upon where roads traverse the landscape, management actions cannot avoid NSO activity centers or their core use areas. Because of this, impacts from roadside hazard treatments are likely to be greater than salvage harvest management actions and may have more long-term negative results."

71. The planning area is home to the threatened coho salmon and its designated critical habitat, and "may affect, likely to adversely affect" this species.

**Elements of the Seiad-Horse Project**

72. There are seven components of the Seiad-Horse Risk Reduction Project ("Seiad-Horse Project"), only two of which Plaintiffs challenge in this action: hazard tree removal and post-fire "salvage" logging.

73. First, the project will reduce hazardous fuels less than 12" dbh adjacent to private property in the project area.

74. Second, the project will conduct site preparation and replanting on 955 acres in the project area.

75. Third, the project will conduct prescribed underburning across 4,508 acres in the project area.

76. Fourth, the project will develop and maintain a 600-foot fuel management zone along a north-south ridge for future fire suppression efforts, which will remove vegetation less than 12" diameter at breast height ("DBH") dbh on 87 acres.

77. Fifth, the project will use a helicopter to place large woody debris (logs, rootwads, etc.) on up to 27 sites on the mainstem of Horse Creek.

PAGE 12 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

78. Plaintiffs do not challenge the forgoing components of the Seiad-Horse Project.

79. A sixth component of the project will remove hazard trees along 39 miles of roads in the project area, which Plaintiffs challenge in this action.

80. Some very large old-growth trees and snags in excess of 45" DBH will be removed as part of the hazard tree removal component of the Seiad-Horse Project, including within a northern spotted owl activity center core use area and within the Riparian Reserve land allocation.

81. Finally, the project proposes 1,814 acres of "risk reduction salvage with site preparation and planting," which Plaintiffs challenge in this action.

82. The "risk reduction salvage" ("post-fire logging") will remove trees equal to or larger than 14" DBH across 1,814 acres in the project area.

83. The project will remove snags, critical old-growth forest features, from the planning area: "generally, for species associated with snags, the Project would reduce the number of snags in the short term."

84. The project will retain only 5 standing dead trees ("snags") per acre on average over 100 acres; most retained snags will be located in no harvest areas located outside of logging units.

85. The project's environmental analysis acknowledges that habitat suitability for many late-successional associated species will decline immediately after project implementation as well as into the future.

86. The EA found that the project "may affect, likely to adversely affect" the northern spotted owl.

87. The Forest Service used three cumulative watershed effects models to assess the effects of the Seiad-Horse Project on hydrology and aquatic resources.

88. The first cumulative watershed effects model, the "equivalent roaded area (ERA)" model, "is a tool for tracking disturbances and is an indicator of cumulative risk to stream channels from increased peak flows."

89. The second cumulative watershed effects model, the "universal soil loss equation (USLE)" model "estimates hill slope soil loss, and amount [of sediment] delivered to a channel."

PAGE 13 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

90. The third cumulative watershed effects model, the "geologic (GEO)" model "compares the estimated landslide sediment production resulting from roads, harvest and fire to undisturbed condition."

91. The EA explains that "all of the 7th field watersheds in Horse Creek are at, or over, threshold of concern for ERA except for East Fork Horse Creek. Three 7th field watersheds within Horse Creek are over threshold for the GEO model, these watersheds are Salt Gulch, Middle Creek, and Lower Horse. The threshold of concern for the GEO model is two times the background landslide volume. East Fork Seiad Creek is the only 7th field watershed over the GEO threshold in the Seiad Creek drainage. Universal soil loss equation (USLE) model results show all of the larger Horse Creek watershed is over threshold except East Fork Horse Creek and Middle Horse Creek. East Fork Seiad Creek is the only 7th field over threshold within the Seiad Creek Drainage. The threshold of concern for USLE is four times the background soil erosion."

92. The EA explains that "Elevated [cumulative watershed effects] values in Horse Creek are caused by the recent Gap and Abney Fires, high road densities, private logging, and land management activities including the Horse Creek Community Protection and Forest Restoration Project."

93. The Seiad-Horse environmental assessment states that "Alternative 2 would increase sediment in West Fork Horse [Creek] by about 10 percent."

94. The Seiad-Horse environmental assessment states that sediment delivery to channels under Alternative 2 in "Salt Gulch would increase by about four percent and East Fork Seiad by about one percent."

95. In addition to this conclusion, the EA states that soil loss delivered to channels in West Fork Horse Creek, Salt Gulch, and East Fork Seiad Creek will increase by 8%, 130%, and 51% above the threshold level, respectively, which is four times background soil loss.

96. The Forest Service's geologic model also "predicts sediment inputs through landslide delivery...The increase will be three percent in Salt Gulch and one percent in East Fork Seiad Creek."

97. In addition to this conclusion, the EA states that landslide sediment in Salt Gulch will increase by 33% above threshold levels, which is two times background sediment production.

98. The EA also states that landslide sediment in East Fork Seiad Creek will increase by 4% above threshold levels, which is two times background sediment production.

99. The Forest Service acknowledges that as a result of implementing ground-based logging in Alternative 2, "sedimentation to streams could be increased by approximately 2,000 cubic yards" per year over the next decade.

100. Furthermore, "fuel treatments that remove vegetation greater than 12" DBH in Riparian Reserves will likely cause a reduction in the current stream shade," leading to an increase in water temperatures.

101. Finally, the ERA analysis indicates that the threshold of concern for West Fork Horse Creek, Middle Horse Creek, Salt Gulch, East Fork Seiad Creek, West Fork Seiad Creek, and Middle Seiad Creek is 6.0, 7.0, 8.5, 6.5, 8.0, and 9.0 accordingly.

102. As a result of the Project, the Cumulative ERA will increase to 9.8, 9.2, 9.8, 12.8, 4.7, and 4.6 for West Fork Horse Creek, Middle Horse Creek, Salt Gulch, East Fork Seiad Creek, West Fork Seiad Creek, and Middle Seiad Creek.  EA, 82.  These values exceed the threshold of concern for all 7th field watersheds except for West Fork Seiad Creek and Middle Seiad Creek.

103. "Project element related disturbance in the East Fork Seiad Creek 7th-field watershed, which is well over threshold in the ERA model, would likely increase adverse effects to aquatic and riparian habitats in this sub-watershed in the short-term. Therefore, special status aquatic species which occur in this watershed could be adversely affected by indirect effects in the short-term."

104. "In the short-term (two to ten years), ground-disturbing project elements that would increase sediment delivery to streams would be adversely cumulative with current high cumulative watershed effects and excessive sedimentation in the Horse Creek watershed... In the short-term (two to ten years), ground-disturbing project elements would increase cumulative watershed effects and sedimentation in the Seiad Creek watershed."

105. The EA observes that "Additive increases in sedimentation, however slight, in watersheds that are over the threshold of concern are likely to further exacerbate adverse effects to aquatic and riparian habitats. In the short-term, project elements would slightly increase sedimentation in the Horse Creek watershed where surface erosion (indicated by the USLE model) is over threshold and mass wasting (indicated by the GEO model) is near threshold, and would increase watershed disturbance (indicated by the ERA model) which is also over threshold. Project elements related to watershed disturbance would slightly increase adverse effects to aquatic and riparian habitats in streams in the Middle Horse Creek, Salt Gulch, and West Fork Horse Creek 7th-field watersheds and in lower mainstem Horse Creek in the short-term because aquatic habitats in these areas are already degraded due to current high levels of watershed disturbance."

106. Because of the impacts to water quality, the EA found that the project "may affect, likely to adversely affect" threatened coho salmon and its habitat.

107. In April 2018, the Forest Service released the Seiad-Horse Risk Reduction Project ("Seiad-Horse Project") Draft Environmental Assessment for public comment. Plaintiffs submitted timely comments on the Draft EA.

108. In June 2018, the Forest Service released the Seiad-Horse Project Final Environmental Assessment and Draft Decision Notice and Finding of No Significant Impact ("DN/FONSI") for administrative objection. Plaintiffs submitted timely objections to the Final EA and Draft DN/FONSI.

109. The Forest Service issued a response to Plaintiff's administrative objection on September 14, 2018.

110. On September 18, 2018, the Forest Service published a revised Final Environmental Assessment ("EA") and final DN/FONSI. The September 2018 final EA and DN/FONSI are the final agency actions challenged here.

/// /// ///
/// /// ///
/// /// ///

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### The Seiad-Horse Post-Fire Project Violates the Aquatic Conservation Strategy and NFMA

111. Plaintiffs incorporate by reference all preceding paragraphs.

112. NFMA requires the Forest Service to design and implement projects that are consistent with the applicable LRMP. 16 U.S.C. §§ 1604(i); 36 C.F.R. § 219.10(e).

113. The Klamath LRMP incorporated the Aquatic Conservation Strategy (ASC) and its nine Objectives (ACSOs).

114. The Aquatic Conservation Strategy states: "Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems. Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction, and migration of individuals composing aquatic and riparian communities."

115. The Aquatic Conservation Strategy states: "Maintain and restore the sediment regime under which aquatic ecosystems evolved. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport."

116. The Aquatic Conservation Strategy states: "Maintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of sediment, nutrient, and wood routing. The timing, magnitude, duration, and spatial distribution of peak, high, and low flows must be protected."

117. Because the Seiad-Horse Project will increase sediment delivery to streams, increase peak flows, and decrease streamside shade and increase water temperatures, the project violates the NFP and the Klamath LRMP, which both prohibit these alterations to aquatic functions and processes. The decision to implement the Seiad-Horse Project is arbitrary, capricious, and not in accordance with NFMA. 5 U.S.C. § 706(2)(A).

118. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to EAJA. 28 U.S.C. § 2412.

**SECOND CLAIM FOR RELIEF**

**The Authorization of Large Snag Removal from the**

**Johnny O'Neil LSR Violates NFMA**

119. Plaintiffs incorporate by reference all preceding paragraphs.

120. NFMA requires the Forest Service to design and implement projects that are consistent with the applicable LRMP. 16 U.S.C. §§ 1604(i); 36 C.F.R. § 219.10(e).

121. The Northwest Forest Plan, which amended the Klamath LRMP, permits logging in LSRs, but restricts the timing, location, type, and amount of salvage logging that may occur.

122. The removal of large diameter, economically valuable snags from the Johnny O' Neil LSR "diminishes habitat suitability now or in the future;" is inconsistent with the LSR Objective of developing of snags; and does not "focus on retaining snags likely to persist until the next stand develops." Consequently, the Seiad-Horse Project is in contravention to the requirements of the NFP and Klamath LRMP, and the decision to implement the Seiad-Horse Project is arbitrary, capricious, and not in accordance with NFMA. 5 U.S.C. § 706(2)(A).

123. Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to EAJA. 28 U.S.C. § 2412.

**THIRD CLAIM FOR RELIEF**

**NEPA Requires the Preparation of an Environmental Impact Statement**

124. Plaintiffs incorporate by reference all preceding paragraphs.

125. NEPA requires federal defendants to prepare an EIS when a major federal action is proposed that *may* significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).

126. In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered.  40 C.F.R. §1508.27.

127. In evaluating intensity, federal defendants must consider numerous "significance" factors including unique characteristics of the geographic area including ecologically significant areas; whether the action is related to other actions with individually insignificant but cumulatively significant impacts (significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment); and whether the action threatens a violation of Federal, State, or

local law or requirements imposed for the protection of the environment.  40 C.F.R. §§ 1508.27(b)(3), (b)(7), (b)(10).

128.   The Seiad-Horse Project proposes post-fire logging within Riparian Reserves, the Johnny O'Neil Late-Successional Reserve, Essential Habitat Connectivity areas, the Cook and Green Botanical Area, and the Kangaroo Inventoried Roadless Areas, all of which are ecologically critical areas for salmonid propagation and recovery as well as preservation of old growth forest conditions.  40 C.F.R. § 1508.27(b)(3).

129.   The Seiad-Horse Project proposes to conduct post-fire logging adjacent to the Pacific Crest Trail, a world-renowned historic and cultural resource, and one of two initial components of the National Trails System designated by Congress through the National Trails System Act of 1968.  16 U.S.C. § 1241(b); 40 C.F.R. § 1508.27(b)(3).

130.   The Seiad-Horse Project will result in adverse cumulative watershed effects.  40 C.F.R. § 1508.27(b)(7).

131.   The Seiad-Horse Project threatens a violation of the Northwest Forest Plan and Klamath LRMP, which in turn would violate the National Forest Management Act, a federal law for the protection of the environment.  40 C.F.R. § 1508.27(b)(10).

132.   The federal defendants failed to prepare an EIS for the Seiad-Horse Project, despite the presence of several significance factors.  Federal defendants' decision to implement and proceed with the proposed action without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA.  5 U.S.C. § 706(2)(A).

133.   Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA.  28 U.S.C. § 2412.

**PRAYER FOR RELIEF**

Based upon the foregoing, Plaintiffs respectfully request that the Court:

1.   Declare that the federal defendants violated the National Environmental Policy Act, National Forest Management Act, Administrative Procedure Act, and their implementing regulations in designing, analyzing, and implementing the Seiad-Horse Project EA and DN/FONSI;

2. Declare that the federal defendants violated the Northwest Forest Plan and Klamath National Forest Land and Resource Management Plan in designing and implementing the Seiad-Horse Project EA and DN/FONSI;

3. Enjoin federal defendants and its agents from proceeding with the Seiad-Horse Project, or any portion thereof, unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this court;

4. Award Plaintiffs their costs of litigation, including reasonable attorney fees under the Equal Access to Justice Act. 28 U.S.C. § 2412.; and

5. Grant Plaintiffs such other and further relief as the Court deems just and equitable.

Date: October 16, 2018.            Respectfully submitted,

　　　　　　　　　　　　　　　　　　 /s/ Tom Wheeler
Tom Wheeler (CA Bar #304191)
Environmental Protection Information Center
145 G Street #A
Arcata, California 95521
tom@wildcalifornia.org
Ph: (707) 822-7711
Fax: (707) 822-7712

Susan Jane M. Brown, Applicant, *Pro Hac Vice*
Western Environmental Law Center
4107 N.E. Couch St.
Portland, Oregon 97232
brown@westernlaw.org
Ph.: (503) 914-1323
Fax: (541) 485-2457

Brodia N. Minter, Applicant, *Pro hac Vice*
Klamath Siskiyou Wildlands Center
P.O. Box 102
Ashland, Oregon 97520
Brodia@kswild.org
Ph: (541) 488-5789
Fax: (541) 552-1561

*Counsel for Plaintiffs*

PAGE 20 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF