UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, ENVIRONMENTAL PROTECTION INFORMATION CENTER, and KLAMATH FOREST ALLIANCE,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICIA A. GRANTHAM, Klamath National Forest Supervisor, and UNITED STATES FOREST SERVICE,<br><br>Defendants,<br><br>and<br><br>AMERICAN FOREST RESOURCE COUNCIL, an Oregon non-profit corporation,<br><br>Intervenor Defendant. | No. 2:18-cv-02785-TLN-DMC<br><br>**ORDER GRANTING MOTION FOR INJUNCTIVE RELIEF** |

This matter is before the Court pursuant to Plaintiffs Klamath-Siskiyou Wildlands Center, Environmental Protection Information Center, and Klamath Forest Alliance's ("Plaintiffs") motion for temporary restraining order and/or preliminary injunction. (ECF No. 13; Mem. Support Mot. Temporary Restraining Order/Prelim. Inj., ECF No. 22.) Federal Defendants Patricia A. Grantham and the United States Forest Service ("Defendants") oppose Plaintiffs'

1

motion. (ECF No. 32.) Intervenor Defendant American Forest Resource Council ("Intervenor Defendant") also opposes this motion. (ECF No. 33.) Plaintiffs filed a reply. (ECF No. 34.) A hearing on the matter was held on January 10, 2019. The Court has carefully considered the arguments raised by the parties' briefing and oral arguments. For the reasons stated below, Plaintiffs' motion for temporary restraining order and/or preliminary injunction (ECF No. 13) is GRANTED.

**I. STATUTORY BACKGROUND**

*i. National Forest Management Act ("NFMA")*

The NFMA and its implementing regulations provide for forest planning and management by the Forest Service at two levels: the forest level and the site-specific project level. 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998). On the forest level, the Forest Service develops a Land and Resource Management Plan ("LRMP") which consists of broad, long-term plans and objectives for the entire forest. In this case the applicable LRMP is the Klamath National Forest LRMP, which is part of the Northwest Forest Plan ("NFP").[1] At the project level, the project must be consistent with LRMP and NFP standards. 16 U.S.C. § 1604(i).

*ii. National Environmental Policy Act ("NEPA")*

The NEPA "is a purely procedural statute." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002). NEPA does not dictate particular results or require that agencies elevate environmental impacts over other concerns. Instead, NEPA provides a process to ensure that agencies take a "hard look" at the environmental consequences of their actions. *Id.* NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

As part of the required "hard look," NEPA and its implementing regulations require federal agencies to prepare a "detailed statement" concerning "every recommendation or report

---

[1] The Northwest Forest Plan was put into place by the Bureau of Land Management in 1994. (ECF No. 22 at 9.) The Northwest Forest Plan established management requirements for all Forest Service land within the range of the northern spotted owl and amended all National Forest LRMPs within the range of the owl, including the Klamath National Forest LRMP. (ECF No. 22 at 9.)

on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The statement must consider the impact of the proposed action, any adverse environmental effects, alternatives to the proposed action, the relationship between short-term uses and the "maintenance and enhancement of long-term productivity," and any irreversible commitments of resources which would result from implementing the action. *Id.* This statement may take the form of an environmental assessment ("EA"), or a longer and more thorough environmental impact statement ("EIS"), which includes a longer public comment period. *See* 40 C.F.R. §§ 1508.9, 1508.11.

In determining whether to prepare an EIS, the agency shall determine: (1) whether the proposed project normally requires an EIS, or (2) if the project is categorically excluded from the preparation of both an EA and an EIS because the action does not individually or cumulatively have a significant effect on the human environment. 40 C.F.R. §§ 1501.4, 1508.4. In making this determination, absent a categorical exclusion of an EA and an EIS, the agency shall prepare an EA to determine whether an additional EIS is needed. 40 C.F.R. 1501.4(c). An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If the agency concludes based on the EA that no additional EIS is required, the agency must prepare a "finding of no significant impact" ("FONSI"). 40 C.F.R. 1501.4(e). In this case, Defendants prepared an EA which culminated in a FONSI. An EIS was not prepared.

The agency must also consider the "cumulative impact" of a proposed project, which the federal regulations define as the result of "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . ." 40 C.F.R. § 1508.7. Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." *Id.* In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7); *see Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th

Cir. 1998).

## II. FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2018, Plaintiffs filed a complaint for declaratory and injunctive relief. (ECF No. 1.) Plaintiffs brought three causes of action, arguing that Defendants violated the National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act when they approved the Seiad-Horse Reduction Project ("Project") in the Klamath National Forest. (ECF No. 1 ¶ 1.)

The Project was put into place in response to the August 2017 Abney Fire, which burned approximately 90,000 acres on the Rogue River-Siskiyou and Klamath National Forests. (Environmental Assessment ("EA") at 1.) Roughly 10,000 acres of the fire were on the Klamath National forest and most of the land burned at moderate to high severity. (EA at 1.) This resulted in about 40 miles of roads lined with fire-killed trees and large pockets of fire-killed trees. (EA at 1.) According to Defendant U.S. Forest Service, as snags continue to decay, break, and fall because of the Abney Fire, the severity and intensity of future fires will increase. (EA at 1.) The increased fire intensities and fallen snags will result in difficulty controlling future fires, putting fire suppression crews at risk, and blocking roadways which will further put suppression crews at increased risk. (EA at 1.)

According to Plaintiffs, the Project is comprised of several components involving the logging of timber from land in the Johnny O'Neil Successional Old Growth Forest Reserve. (ECF No. 1 ¶ 10.) Intervenor Defendant states that the Project was designed to respond to the 2017 Abney Fire, which destroyed roughly 5,000 acres of late-successional forest. (ECF No. 25-1 at 2.) Plaintiffs are challenging two specific actions of the Project: proposed hazard tree removal and post-fire "salvage" logging. (ECF No. 1 ¶ 72.) The Project aims to remove hazardous tree and fuel conditions, especially within one quarter mile of private properties in burned areas. (EA at 1.) According to the U.S. Forest Service, "[t]here is a need to remove this material as quickly as possible to address public and worker safety and maintain the economic viability of the project." (EA at 1.)

On September 28, 2018, based on a review of the EA, Defendants issued a Decision

Notice approving the Project. (Decision Notice, ECF No. 32-2.) The Decision Notice found that:

> By removing dead and dying trees along roadways, the project improves safety conditions for the public, forest workers, and for current and future firefighters using roads to respond to new fires. By removing dead and dying trees and smaller live trees from National Forest System lands adjacent to private property, the project helps protect neighboring landowners in the event of inevitable future fires.

(ECF No. 32-2 at 4.) The Decision Notice further took into consideration "what will happen should risk reduction treatments not be undertaken," and determined that:

> about 60 percent of the project area will be subject to high fire intensity in the future under this scenario, a marked expansion of the high severity impacts created by 2017's Abney Fire. This is attributable to trees killed by the Abney Fire, left unabated, weakening and falling to the ground over time, mixing with re-sprouting shrubs, hardwoods, grasses and small naturally reseeded trees, to create a fuel load that will reburn at high severity when fire returns. The resultant high severity burn will not only remove any slowly reestablishing forest, but has the high potential to convert the area to a non-forested brush field condition for a long term period.

(ECF No. 32-2 at 4.) Moreover, noting the importance of burned areas to the habitat and ecosystem diversity, the Decision Notice explains that over 88% of the Project area will have no risk reduction salvage undertaken, and 74% of the Project area will have no trees planted for restoration. (ECF No. 32-2 at 6.)

According to Plaintiffs, on October 30, 2018, Plaintiffs learned that Defendant United States Forest Service had identified a bidder for the "Low Gap" timber sale, the first of three sales authorized by the Project. (ECF No. 13 at 2.) On November 7, 2018, Defendants informed Plaintiffs that the Forest Service intended to authorize the implementation of the Low Gap timber sale. (ECF No. 13 at 2.)

Intervenor Defendant is a regional trade association representing over 50 forest product businesses and forest landowners, including the purchaser of the Low Gap timber sale. (ECF No. 13 at 2; ECF No. 25-1 at 3.) Intervenor Defendant states they are interested in the Project because the Project will supply timber to its members. (ECF No. 25-1 at 3.) Intervenor Defendant is further concerned about "the economic, environmental, and safety benefits of the project, which are threatened by this litigation." (ECF No. 25-1 at 2.)

### III. STANDARD OF LAW

A. <u>Injunctive Relief</u>

A temporary restraining order is an extraordinary and temporary "fix" that the court may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of a temporary restraining order is to preserve the status quo pending a fuller hearing. *See* Fed. R. Civ. P. 65. It is the practice of this district to construe a motion for temporary restraining order as a motion for preliminary injunction. Local Rule 231(a); *see also Aiello v. One West Bank*, No. 2:10-cv-0227- GEB-EFB, 2010 WL 406092 at *1 (E.D. Cal. Jan. 29, 2010) ("Temporary restraining orders are governed by the same standard applicable to preliminary injunctions.") (internal quotation and citations omitted).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added); *see also Costa Mesa City Employee's Assn. v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial.") (internal quotation marks omitted); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.") (internal quotation marks omitted). In cases where the movant seeks to alter the status quo, preliminary injunction is disfavored and a higher level of scrutiny must apply. *Schrier v. University of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Preliminary injunction is not automatically denied simply because the movant seeks to alter the status quo, but instead the movant must meet heightened scrutiny. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits...so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious question going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor. *Id.* at 1134–35.

B. <u>Administrative Procedure Act ("APA")</u>

Agency compliance with NEPA is reviewed under the APA. 5 U.S.C. §§ 701–706; *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012). Review is generally limited to the administrative record that was before the agency at the time of its decision. *Grand Canyon Trust*, 691 F.3d at 1016 n.10; *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). A court may set aside an agency action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir.2007) (quotation and citation omitted).

Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners*

*for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA. . . ." *Id.* The Ninth Circuit has held that "[t]he [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Id.* (quotation and citations omitted).

The APA does not allow a reviewing court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Id.* This is especially true in the context of management of Service lands, for Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands. *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

**IV. ANALYSIS**

To succeed on their motion, Plaintiffs must make a showing on all four elements of the *Winters* test. *Alliance for the Wild Rockies*, 632 F.3d at 1135. The Court therefore addresses each prong of the injunctive relief analysis in turn.

A. <u>Likelihood of Success on the Merits</u>

For a preliminary injunction to issue, it is Plaintiffs' burden to show a likelihood of success on the merits of their claims. Plaintiffs' bring three arguments in this regard: (1) the Project violates the NFMA by failing to comply with the Aquatic Conservation Strategy ("ACS") (ECF No. 22 at 10); (2) the authorization of large snag removal from the Johnny O'Neil LSR violates NFMA; and (3) the Forest Service was required to prepare an EIS in addition to an EA.

*i.    Whether the Project Violates NFMA by Failing to Comply With the ACS*

Plaintiffs argue that the Project fails to comply with three of the ACS objectives (Objectives 4, 5, and 6) which require projects to "maintain and restore water quality, sediment regimes, and in-stream flow regimes." (ECF No. 22 at 10 (quotations and citations omitted).) Defendants respond that the Forest Service "carefully evaluated the Project and reached the well-founded conclusion that the Project is consistent with ACS objectives." (ECF No. 32 at 10.)

The ACS of the Northwest Forest Plan "was developed to restore and maintain the ecological health of watersheds and aquatic ecosystems contained within them . . . [and to]

protect salmon and steelhead habitat on federal lands." (Nw. Forest Plan's Standards and Guidelines for Mgmt. of Habitat for Late-Successional and Old-Growth Forest Related Species Within Range of N. Spotted Owl, ECF No. 32-7 at 26; ECF No. 22 at 9.) "The purpose of ACS is to maintain and restore ecosystem health at watershed and landscape scales to protect habitat for fish and other riparian-dependent species and resources and restore currently degraded habitats." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–36 (9th Cir. 2001).

To satisfy ACS objectives, the Forest Service's analysis must describe the existing condition at the Project site, describe the affected watershed's range of natural variability, and explain how the proposed project maintains or restores conditions. *Id.* at 1036. The Court must afford the Forest Service "substantial deference" in their interpretation and implementation of its plan unless the determination that the Project was consistent with ACS objectives was "arbitrary and capricious." *Bark v. Northrop*, 607 F. App'x 652, 655 (9th Cir. 2015).

Objective 4 of the ACS requires maintaining and restoring water quality.[2] (Aquatic Conservation Strategy Objectives, Northwest Forest Plan, Standards and Guidelines, B-11, https://www.blm.gov/or/plans/nwfpnepa/FSEIS-1994/newsandga.pdf. ("ACS Objectives").) Plaintiffs contend that the Project violates ACS Objective 4 because the Project's effects of sedimentation violate the ACS requirement to maintain and restore water quality. (ECF No. 22 at 11–12.) Defendants respond that the "EA explains how the Forest Service carefully evaluated the Project's cumulative effects with other activities and found both that short-term effects will fall within the natural range of variability and that over the longer term, the Project will lead to a cumulative improvement in water quality by reducing sedimentation." (ECF No. 32 at 11.)

The EA states that "[i]n the short term (two to ten years), ground-disturbing project elements that would slightly increase sediment delivery to streams would be adversely cumulative with current high cumulative watershed effects and excessive sedimentation in the Horse Creek and Seiad Creek watershed[s]." (EA at 90.) The EA explains that "any additional impact, no

---

[2] Because Plaintiffs' argument with respect to Objective 4 is well taken, the Court declines to address the parties' arguments as to Objectives 5 and 6.

9

matter how slight, would result in adverse effects." (EA at 90.) The EA looked at the impact of the Project on existing watersheds. (EA at 82–83.) Despite Defendants' contention that the short-term impacts are within the natural range of variability, and the long-term results will be beneficial (ECF No. 32 at 11), it is clear that for at least some of the watersheds, the increase in sedimentation is well above the threshold for the natural range of variability. (*See* EA at 82 (recognizing a 33% "[i]ncrease above [t]hreshold" in the Salt Gulch Watershed).) "Given that overall protection of forest and water resources is the concern of both NFP and ACS, it does not follow that [the agency] is free to ignore site degradations because they are too small to affect the accomplishment of that goal at the watershed scale." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc.*, 265 F.3d at 1035.[3]

As in *Cascadia Wildlands Project v. U.S. Fish & Wildlife Serv.*, "other than a conclusion that in the long-term there may be some restorative benefit from the reconstruction, there is no analysis of the extent of the short-term degradation in the context of ACS objectives." 219 F. Supp. 2d 1142, 1149 (D. Or. 2002). Similarly, Plaintiffs here have raised serious questions as to whether Defendants acted arbitrarily and capriciously in failing to take into consideration the short-term impacts as required by the ACS.

   ii. *Whether the authorization of large snag removal from the Johnny O'Neil LSR violates NFMA*

Plaintiffs claim Defendants violated the NFP by permitting large diameter snag removal in the Johnny O'Neil LSR in two ways: (1) they drew boundaries larger than the harvest unit, essentially diluting the effect of the some-is-enough standard; and (2) the Forest Service failed to consider how the salvage operations would diminish habitat suitability now or in the future. (ECF No. 22 at 14-15.) In response, Defendants argue that: (1) the boundaries are permissible under the KFP; and (2) the habitat suitability will be maintained in the long-term (ECF No. 32 at 17).

---

[3]  At the motion hearing on January 10, 2019, Defendants argued that *Pacific Coast Federation of Fisherman Associations Inc.* is inapplicable because the agency in that case "wholly disregarded evaluation short-term impacts . . . and that is not the situation here." Defendants, however, failed to respond to Plaintiffs' argument that here, while there were tables explaining the short-term impacts, Defendants have not cited to any evidence or analysis other than the tables themselves that show that the *short-term* impacts are within the range or variation.

a. <u>Snag Removal Boundaries</u>

Plaintiffs, citing *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007), assert that "most of the snags the Forest Service are retaining are not located within harvest units," which they contend is exactly what the court in *Brong* determined violated the NFP. (ECF No. 22 at 14.) Plaintiffs claim the Forest Service has "drawn harvest unit boundaries larger than the footprint of the harvested acres, such that the unharvested areas will be where snags, if any, will be retained." (ECF No. 22 at 14.) Plaintiffs argue that Defendants' boundaries are "different than the requirements of the NFP and [do] not address the wildlife needs of . . . [the] northern spotted owls . . . ." (ECF No. 34 at 8.)

Defendants argue that *Brong* is inapplicable because (1) unlike in *Brong*, here the snag removal is conducted under the KFP and is consistent under the NFP, (2) the Project includes a mix of snag retention both within and around treatment units, and (3) economic factors were not at issue here as they were in *Brong*. (ECF No. 32 at 15.) The Court rejects Defendants' arguments, as discussed below, and finds *Brong* is on point here.

Defendants first argue that "Plaintiffs err in directing the Court's attention to the broad standards and guidelines in the NFP," because the activities are governed by the "KFP, which was adopted after the NFP was issued." (ECF No. 32 at 13.) According to Defendants, the KFP incorporates applicable direction from the NFP, but is specifically tailored to the Klamath National Forest. (ECF No. 32 at 13.) Plaintiffs, however, point out that the NFP was incorporated into the KFP. (ECF No. 34 at 8.) As Plaintiffs assert, the NFP specifically states that the NFP applies to the Klamath National Forest and "will be incorporated into Forest Plans as they are developed." Northwest Forest Plan, Standards and Guidelines, A2, https://www.blm.gov/or/plans/nwfpnepa/FSEIS-1994/newsandga.pdf.

Defendants' second argument, that the NFP only requires that the agency focus on retaining, not retain all, snags likely to persist is unpersuasive for similar reasons. (ECF No. 32 at 14.) Defendants cite to the KFP's snag retention guidelines, which they argue are applicable forest-wide. (ECF No. 32 at 14.) While the KFP does include a forest-wide standard that allows for the averaging of snags per 100 acres, the standard in the KFP does not take into account the

11

impact snag retention will have on the northern spotted owl. *See* Klamath Forest Plan, 4-30, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5333203.pdf (listing the species as: downy woodpecker, red breasted sapsucker, hairy woodpecker, black backed woodpecker, white-headed woodpecker, pileated woodpecker, and vaux's swift). The NFP on the other hand established management requirements for all Forest Service land within the range of the northern spotted owl. (ECF No. 22 at 9.) Plaintiffs argue—and the Court agrees—that the NFP is operative because the habitat suitability for the northern spotted owl is specifically at issue here. (ECF No. 34 at 8.)

The Court finds Defendants' third argument, that *Brong* is inapplicable because economic factors are not at issue here as they were in *Brong*, similarly unconvincing. (*See* ECF No. 32 at 15.) It is clear from the record that economic factors were at issue here. While the purpose and need statement for the Project does not mention economic factors, it is apparent that economic factors were central to the agency's decision-making. Defendant Grantham's declaration lists numerous statements indicating the economic value of the Project. (*See, e.g.*, ECF No. 32-3 at ¶ 8 ("[It is essential that the Project be implemented without delay, so that the timber value of burned trees can help off-set the costs of treatment."); ECF No. 32-3 at ¶ 9 ("[M]uch of timber in the Project area has already experienced significant value and volume loss. As timber volume and value decline, the ability to leverage the commercial value of dead trees to pay for their removal and for hazardous fuel reduction treatments becomes increasingly less likely."); ECF No. 32-3 ¶ 10 ("The sooner timber sale contractors begin operations, the higher the chance that sound, merchantable timber will be harvested.").)

As such, the Court finds *Brong* illustrative. Accordingly, Plaintiffs have raised serious questions as to whether the boundaries of the Project were in compliance with the NFP.

        b. <u>Habitat Suitability</u>

The instant action similarly calls into question whether the Project will decrease the habitat suitability for the threatened northern spotted owl. Defendants emphasize the Project's effects on the "*long-term*" maintenance of the habitat, (ECF No. 32 at 16,) but fail to address the short-term impacts of the Project.

In *Brong*, the plaintiffs challenged the project at issue arguing it violated the NFP because it proposed the "excessive removal of large diameter dead or dying trees, impermissible research logging, and timber removal in 'non-suitable woodlands.'" *Id.* at 1124. The court determined that the BLM's practice averaging "salvaged and non-salvaged areas together across all the acres included in the logging" to claim the snag retention was "enough" under the NFP was misleading. *Id.* at 1129–30. The court further reasoned that the BLM "neglect[ed] to explain why the snag removal it d[id] authorize, which indisputably harm[ed] late successional habitat in the short term, w[ould] somehow maintain overall habitat suitability now or in the future as expressly required by the NFP." *Id.* at 1131.

Here, the EA on its face states that "substantial amounts of habitat are projected to be degraded by the proposed actions." (EC at 113.) While the EA explains that this will not affect the viability of the northern spotted owl in the long-term, it does not appear to explain whether the current habitat suitability will be maintained, as required by the NFP, other than stating that the viability of the species as a whole will be maintained. (EA at 113.) This analysis of the short-term impacts of the Project is insufficient under *Brong*. 492 F.3d at 1131 ("The BLM's decision to preserve a baseline number of snags is insufficient in a fundamental way: it neglects to explain why the snag removal it *does* authorize, which [i]ndisputably harms late-successional habitat in the short term, will somehow maintain overall habitat suitability now or in the future, as expressly required by the NFP.") Accordingly, Plaintiffs have raised serious questions as to whether the short-term habitat suitability of the northern spotted owl will be impaired.

       *iii.*    *Whether NEPA requires the preparation of an EIS*

To prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). "It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Id.* As discussed above, the Court concludes that Plaintiffs have raised substantial questions about the environmental impacts of the Project such that an EIS might have been required.[4]

---

[4] The Court need not and does not address Plaintiffs' argument that proximity of the Project to ecologically

1    Accordingly, Plaintiffs arguments have raised serious questions regarding the merits of
their claims. *See All. for the Wild Rockies*, 632 F.3d at 1134–35 ("A preliminary injunction is
appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were
raised.").

### B. Irreparable Injury

Plaintiffs must prove that absent an injunction, irreparable injury is likely. *Winter*, 555 U.S. at 22. "[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citing *Lands Council*, 537 F.3d at 1004). Plaintiffs argue they will suffer irreparable and immediate injury if the Project is implemented. (ECF No. 22 at 23.) Plaintiffs contend their enjoyment of the areas at issue will be diminished and there are no "substitute areas" where Plaintiffs can go for the same experience. (ECF No. 22 at 24.) Further, Plaintiffs assert they have demonstrated a real interest in the health and recovery of post-fire environments and intact ecosystems recovering from natural disturbance, such as old-growth forests which "cannot grow back within their lifetimes." (ECF No. 22 at 23.) Defendants respond that delay of the Project will cause both economic injury to Defendants as well as elevated fire risks. (ECF No. 32 at 23.) Defendants further contend that any harm Plaintiffs allege ignores the overall improvement of the area habitat. (ECF No. 32 at 21–22.)

Plaintiffs have satisfied their burden. As this Court previously noted, "[t]he very nature of logging is that its completion is irreparable." (ECF No. 43 at 3.) Further, as Plaintiffs point out, any economic harm suffered by Defendants is not similarly irreparable. (*See* ECF No. 22 at 24.) Should Defendants prevail in this litigation, they are not barred from eventually implementing the Project. Plaintiffs, on the other hand, would have no available recourse. This factor weighs in their favor.

### C. Balance of the Equities and Public Interest

"The purpose of preliminary injunctive relief is to preserve the status quo if the balance of

---

critical areas requires the preparation of an EIS. (ECF No. 22 at 18.)

14

equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined." *Heflebower v. U.S. Bank Nat. Ass'n*, 2013 WL 3864214, at *18 (E.D. Cal. July 23, 2013) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 376–77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In light of Plaintiffs' showing of serious questions regarding their likelihood of success on the merits and of likely irreparable harm, the balance of equities and public interest tip sharply in favor of Plaintiffs as any potential irreparable harm to Plaintiffs outweigh any harm a delay would cause Defendants. *See All. for the Wild Rockies*, 632 F.3d at 1134–35 (9th Cir. 2011) ("A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."); *see also South Fork Band Council of Western Shoshone of Nevada v. United States Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (holding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest).

These factors weigh in favor of granting Plaintiffs' request for injunctive relief.

V. **CONCLUSION**

Accordingly, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction/Temporary Restraining Order. (ECF No. 13.)

Dated: January 25, 2019

Troy L. Nunley
United States District Judge