8          UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA

10

11   KLAMATH-SISKIYOU WILDLANDS              No.  2:18-cv-02785-TLN-DMC
     CENTER, ENVIRONMENTAL
12   PROTECTION INFORMATION
     CENTER, and KLAMATH FOREST
13   ALLIANCE,                              **ORDER GRANTING DEFENDANTS'**
                                            **MOTION FOR A STAY OF THE**
14              Plaintiffs,                 **PRELIMINARY INJUNCTION**

15        v.

16   PATRICIA A. GRANTHAM, Klamath
     National Forest Supervisor, and UNITED
17   STATES FOREST SERVICE,

18              Defendants,

19        and

20   AMERICAN FOREST RESOURCE
     COUNCIL, an Oregon non-profit
21   corporation,

22              Intervenor Defendant.

23

24

25        This matter is before the Court on American Forest Resource Council's ("Intervenor

26   Defendant") Motion for a Stay of the Preliminary Injunction Pending Appeal (ECF No. 64), and

27   on Patricia A. Grantham and United States Forest Service's ("Federal Defendants") Motion for a

28   Stay of the Preliminary Injunction Pending Appeal (ECF No. 66).   Plaintiffs have filed a

response. (ECF No. 67.) Federal Defendants and Intervenor Defendant have filed replies. (ECF Nos. 70, 71.) For the reasons set forth below, the Court GRANTS both Federal Defendant's and Intervenor Defendant's motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2018, Plaintiffs filed a complaint for declaratory and injunctive relief. (ECF No. 1.) Plaintiffs brought three causes of action, arguing that Federal Defendants violated the National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act when they approved the Seiad-Horse Reduction Project ("Project") in the Klamath National Forest. (ECF No. 1 ¶ 1.)

On November 12, 2018, Plaintiffs filed a motion for temporary restraining order and preliminary injunction blocking the implementation of the Project pending a resolution of the merits of this case. (ECF No. 13.) This Court granted Plaintiffs' motion, stating Plaintiffs had shown "serious questions regarding their likelihood of success on the merits and of likely irreparable harm," and found that "the balance of equities and public interest tip sharply in favor of Plaintiffs as any potential irreparable harm to Plaintiffs outweigh any harm a delay would cause Defendants." (ECF No. 52 at 15.) Intervenor Defendant and Federal Defendants filed timely notices of appeal (ECF Nos. 55, 60), which are still under consideration by the Ninth Circuit.

Now, both Intervenor Defendant and Federal Defendants have filed motions to stay this Court's issuance of a preliminary injunction pending a decision by the Ninth Circuit. (ECF Nos. 64, 66.)

## II. STANDARD OF LAW

A stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks and alterations omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34. However, the standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction. *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). Here, four considerations govern the Court's analysis in ruling on this

motion: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the stay applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other interested parties; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

In other words, the "factors [that] inform . . . the decision to stay pending appeal . . . are essentially the same as [those] applicable to a motion for a preliminary injunction[.]" *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, No. 2:15–CV–00133–KJM–AC, 2015 WL 3623369, at *1 (E.D. Cal. June 9, 2015). Consequently, the Court assumes the Ninth Circuit's so-called "serious question' approach" also applies to a motion for a stay pending an appeal in the same manner it now applies to preliminary injunctions. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (explaining "the 'serious questions' approach survive[d] *Winter* when applied as part of the four-element *Winter* test"). That is, there is an alternative ground upon which a court may issue a stay pending an appeal, even where the movant has not shown it is likely to succeed on the merits of that appeal. It operates as follows: "serious questions going to the merits and a balance of hardships that tips sharply towards the [appellant] can support issuance of a [stay pending appeal], so long as the [appellant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (internal quotation marks omitted).

**III.  ANALYSIS**

Federal Defendants argue in their motion for a stay that (1) they are likely to succeed on the merits of their appeal, (2) they will be irreparably harmed in the absence of a stay, (3) Plaintiffs' recreation interest in the forest will not be substantially harmed, and (4) a stay of the preliminary injunction is in the public's interest. (ECF No. 66-1.) Intervenor Defendant argues (1) they, along with their members will be irreparably harmed if a stay is not granted, (2) they have made a strong showing of success on appeal, (3) an injunction issued because of a presumed balance of harms is subject to reversal, and (4) the public interest favors a stay. (ECF No. 64-1.) In response, Plaintiffs state that the Court properly granted the motion for a preliminary injunction and they have raised serious questions which are likely to prevail on the merits.

1          A.      Likelihood of Success

2          Federal Defendants first argue that Plaintiffs did not raise serious questions as to the

3   merits of their claims.  (ECF No. 66-1 at 13.)

4                  i.      *Whether the Project is Consistent with the Aquatic Conservation*

5                          *Strategy*

6          Federal Defendants first state that the Court "conflated the terms 'threshold of concern'

7   and [natural range of variability ("NRV")] to conclude the Project violates the [Aquatic

8   Conservation Strategy ("ACS")]."  (ECF No. 66-1 at 14.)  Federal Defendants argue that the

9   Project's "short-term impacts are within the NRV."  (ECF No. 66-1 at 15.)  Federal Defendants

10  continue to argue that the ACS does not prohibit short-term impacts, and the Forest Service

11  properly considered those impacts.  (ECF No. 66-1 at 15.)  Plaintiffs respond that the Project does

12  not comply with the ACS because the Project will increase turbidity of area waterways and will

13  increase cumulative watershed effects.  (ECF No. 67 at 8.)

14         In demonstrating ACS compliance, the Forest Service "must manage the riparian-

15  dependent resources to maintain the existing condition or implement actions to restore conditions.

16  The baseline from which to assess maintaining or restoring the condition is developed through a

17  watershed analysis. Improvement relates to restoring biological and physical processes within

18  their ranges of natural variability."  (SHAR_E_2158.)  "In order to make the finding that a project

19  or management action 'meets' or 'does not prevent attainment' of the Aquatic Conservation

20  Strategy objectives, the analysis must include a description of the existing condition, a description

21  of the range of natural variability of the important physical and biological components of a given

22  watershed, and how the proposed project or management action maintains the existing condition

23  *or* moves it within the range of natural variability."  (SHAR_E_2158 (emphasis added).)

24         The Court acknowledged that so long as the impacts of a Project are within the range of

25  natural variability, the actions would be permissible under the ACS.  (*See* ECF No. 52;

26  SHAR_E_2158.)  For Objective 4, the Forest service recognized turbidity will be increased in the

27  short term; however, the Forest Service concluded that the Project's effects on water quality will

28  not be significant.  (SHAR_A_00147–48.)  And while Federal Defendants argue that Objective 4

4

describes the "NRV for water quality as having short-term bouts of turbidity," the Court is not convinced that the Environmental Assessment states that the outcomes of Objective 4 fall within the NRV. For instance, the section cited by Federal Defendants outlining the outcomes of Objective 4, under the "Range of natural variability" heading reads:

> Historically, in the range of natural variability, before European contact water temperature and turbidity would fluctuate in response to wildfires, landslide events, and other stochastic events. Wildfires would reduce shading to streams until canopy cover over streams recovered. Landslide events would widen and shallow stream channels, and remove riparian vegetation shading streams, resulting in greater rate of stream heating and cooling. Landslide events would cause acute bouts of turbidity that would generally be short in duration.

(SHAR_A_00147.) Neither the "Action Influence on Objective 4" heading nor the "Determination" heading directly addresses whether the outcomes of Objective 4 fall within the NRV. Compare this with Objective 3, where the Environmental Assessment expressly states that the outcomes "would not increase past natural range of variability at the seventh field scale and beyond," (SHAR_A_00147), the Objective 4 determination merely states that:

> Project elements would maintain and restore ACS Objective 4 because: (1) While water temperature may be increased in the short term at the site scale, stream shading will be improved by riparian planting in the long term; and (2) While turbidity will be increased in the short term and at the site scale during legacy sediment site treatment and large wood placement it will be improved drastically by these treatments in the long term. Legacy sediment site treatments will also have a net sediment savings at the seventh through fifth field watershed scale.

(SHAR_A_00148.) At no point does the determination for Objective 4 mention that the outcomes, including the increased water temperature and increased turbidity, fall within the NRV. Nothing within the NRV heading expressly states that the outcomes for the objective are within the NRV. Thus, even if the Court's reliance on the "threshold of concern" was inadequate, the Court is still unconvinced by Federal Defendants' present argument. Plaintiffs still raise substantial questions regarding whether Objective 4 fails to comply with the ACS requirements.

     *ii.  Whether the Project is Consistent with the Northwest Forest Plan's Guidelines for Snag Retention*

  Federal Defendants next argue that Plaintiff and the Court's reliance on *Oregon Natural*

*Resources Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007), was misplaced. (ECF No. 66-1 at 15–16.)

Federal Defendants argue that the Forest Service properly used the Klamath Forest Plan's numerical standards when assessing the number and locations of snags to retain. (ECF No. 66-1 at 16.) Federal Defendants state that *Brong* is inapplicable because the agency at issue in *Brong* "did not have any forest plan numerical standards for retaining snags and lacked a basis for determining a proper snag-retention method." (ECF No. 66-1 at 16 (emphasis added).) Federal Defendants contend that the Klamath Forest Plan's ("KFP") numerical standards should have been accorded substantial deference as expressed in *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 208).[1] (ECF No. 66-1 at 16.)

Plaintiffs respond stating that the KFP, which allows the Forest Service to retain or average snags over 100 acres, only addresses the needs of "primary cavity-association species" such as woodpeckers and that the Forest Service was required to comply with the NFP in planning and implementing the Project. (ECF No. 67 at 11.) As this Court previously explained,

> Defendants cite to the KFP's snag retention guidelines, which they argue are applicable forest-wide. (ECF No. 32 at 14.) While the KFP does include a forest-wide standard that allows for the averaging of snags per 100 acres, the standard in the KFP does not take into account the impact snag retention will have on the northern spotted owl. *See* Klamath Forest Plan, 4-30, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb533 3203.pdf (listing the species as: downy woodpecker, red breasted sapsucker, hairy woodpecker, black backed woodpecker, white-headed woodpecker, pileated woodpecker, and vaux's swift). The NFP on the other hand established management requirements for all Forest Service land within the range of the northern spotted owl.

(ECF No. 52 at 11–12.)

While the Court is required to defer to the Forest Service, it is clear that the KFP does not expressly consider the Northern Spotted Owl ("NSO") in terms of snag retention standards. And, at issue in this case is the NSO. The NFP clearly states that "salvage operations should not diminish habitat suitability [for the NSO] now or in the future." (SHAR_E_02195.) Defendants' contention that "[w]hether the KFP's snag-retention standards contemplates impacts on NSO

---

[1]    In *Lands Council*, the court stated that the "law [] requires us to defer to an agency's determination in an area involving a 'high level of technical expertise.'" *Lands Council*, 537 F.3d at 993.

1  habitat is irrelevant" (ECF No. 66-1 at 16) is misguided.  As the Court stated in its prior order, the

2  NFP was incorporated into the KFP (ECF No. 52 at 11); thus, the Forest Service must

3  contemplate the "habitat suitability" of the NSO.

4  Federal Defendants acknowledge that the Project explicitly states that because of the

5  Project's logging operation there will be short and long-term degradation of the NSO's habitat

6  elements.  (ECF No. 70 at 7.)  Defendants, however, argue that no "suitable habitat" will be

7  removed and to the extent the Project does "'degrade' or 'downgrade' suitable habitat, that habitat

8  remains suitable."  (ECF No. 66-1 at 18.)  Plaintiff, in response, concedes that the Project does

9  not degrade "suitable habitat" as used to reference unburned habitat.  (ECF No. 67 at 13.)

10  Plaintiff instead states that the Project does not comply with the NFP's understanding of "*habitat*

11  *suitability*," which Plaintiff argues is different than "suitable habitat."  (ECF No. 67 at 13.)

12  Plaintiffs fail to provide the Court with any citation to support their contention that these terms

13  are different.  Without persuasive evidence to the contrary, the Court must defer to the Forest

14  Service's findings that no suitable habitat will be removed.  In requesting a motion to stay the

15  injunction, Federal Defendants have demonstrated a likelihood of success on this claim.

16            *iii.*        *Whether an Environmental Impact Statement Was Required*

17  Federal Defendants argue that, contrary to the Court's prior finding, the Project does not

18  necessitate an Environmental Impact Statement ("EIS").  (ECF No. 66-1 at 19.)  In their initial

19  motion, Plaintiffs argued that an EIS was required because the Project will have significant

20  environmental effects, and in particular, because the Project violated NEPA based on 3 of the 10

21  intensity factors set forth in the NEPA regulations: (1) proximity to ecologically critical areas, (2)

22  potential cumulative effects, and (3) a threatened violation of 40 C.F.R. § 1508.27(b)(10).  (ECF

23  No. 22 at 18–23.)   The Court stated that to prevail on a claim that the Forest Service violated its

24  statutory duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact

25  occur."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

26  "It is enough for the plaintiff to raise substantial questions whether a project may have a

27  significant effect on the environment."  *Id.*

28  Federal Defendants state that the Court only found an NFMA violation, and argue this is

1  insufficient to conclude that an EIS is required.  (ECF No. 66-1 at 19.)  The Court stated that "the

2  Plaintiffs [] raised substantial questions about the environmental impacts of the Project such that

3  an EIS might have been required."  (ECF No. 52 at 13.)  However, as Plaintiffs point out, the

4  Court, in its prior order, considered the cumulative effects factor and threatened violations of the

5  law which included a NEPA violation.  (*See* ECF No. 52.)  The Court does not find that Federal

6  Defendants have demonstrated a likelihood of success on the merits for this argument.

7  　　　　　　　　　　　　B.　　　　Irreparable Harm

8  　　　　　　Federal Defendants argue that delaying the Project will result in the burned timber losing

9  value.  (ECF No. 66-1 at 20.)  If this happens, Federal Defendants contend that the Forest Service

10  will lose the source of funds necessary to implement specific Project activities which will reduce

11  the likelihood of a future catastrophic fire.  (ECF No. 66-1 at 20.)  In its initial order, this Court

12  determined that the harm to Federal Defendants was not irreparable because the Forest Service

13  would not be barred from eventually implementing the Project if it succeeded at a later stage in

14  the litigation.  (ECF No. 66-1 at 20.)  But based on evidence subsequently provided by Federal

15  Defendants, it appears that if the injunction remains in place, non-enjoined portions of the Project

16  may actually become permanently futile if the enjoined salvage operations are precluded from

17  taking place immediately.  (*See* ECF No. 67 at 6.)

18  　　　　　　Plaintiffs argue that Federal Defendants' argument boils down to the contention that if the

19  injunction is not stayed, there will be economic harm to both the Forest Service and AFRC.  (ECF

20  No. 67 at 15.)  The Court is not persuaded by this argument.  Federal Defendants explain that

21  "[t]he salvage harvest is necessary both to safely and effectively implement site-preparation and

22  reforestation and because it is the only source of funds for implementing the Project's non-

23  enjoined treatments."  (ECF No. 66-1 at 6.)  According to evidence provided by Federal

24  Defendants, the commercial value of the fire-killed trees to be salvaged is rapidly declining to

25  such an extent that if the injunction remains in effect through the summer months, the timber will

26  lose its remaining economic value.  (ECF No. 66-1 at 6.)  This economic harm cannot be

27  mitigated to any significant degree if the timber continues to lose value during the pendency of

28  the Court's injunction.  Federal Defendants' evidence shows that dollars generated by the

8

1    enjoined portions of the Project make it possible for the non-enjoined portions of the Project to

2    proceed. (ECF No. 66-1 at 6.) Hence, while on its face it appears that Federal Defendants are

3    concerned about economic harm, the reality is that this economic harm is a proxy for the non-

4    enjoined aspects of the Project. Accordingly, the Court finds that Federal Defendants

5    demonstrated the potential that they will suffer irreparable harm if this Project remains enjoined.

6                              C.    Injury to Plaintiffs

7           As discussed in this Court's prior order, Plaintiffs argue they will suffer irreparable

8    and immediate injury if the Project is implemented. (ECF No. 22 at 23.) Plaintiffs contend their

9    enjoyment of the areas at issue will be diminished and there are no "substitute areas" where

10   Plaintiffs can go for the same experience. (ECF No. 22 at 24.) Further, Plaintiffs assert they

11   have demonstrated a real interest in the health and recovery of post-fire environments and intact

12   ecosystems recovering from natural disturbance, such as old-growth forests which "cannot grow

13   back within their lifetimes." (ECF No. 22 at 23.) There is clearly injury to Plaintiffs should the

14   Court grant this stay, and thus, this factor weighs in favor of Plaintiffs.

15                             D.    Public's Interest

16          Federal Defendants argue again that the Project will "reduce the risk of another

17   catastrophic and dangerous fire." (ECF No. 66-1 at 10.) Moreover, Federal Defendants argue

18   that the delay in implementation will prevent the Project, in its entirety, from ever being

19   implemented. In its prior order, the Court reasoned that "[s]hould Defendants prevail in this

20   litigation, they are not barred from eventually implementing the Project." (ECF No. 52 at 14.)

21   However, in their motion to stay, Federal Defendants explain that this is no longer the case, as

22   without a stay they will be barred from implementing the Project.

23          As this Court previously noted in a separate matter, the public has an interest in

24   "reduc[ing] the chance that a catastrophic fire will again threaten the community." *Ctr. for*

25   *Biological Diversity v. Hays*, 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *12 (E.D. Cal.

26   Oct. 8, 2015). As evidenced in the declaration of Defendant Patricia Grantham, Klamath Forest

27   Supervisor, critical components of the Project will be "doomed" should the injunction remain in

28   place including: fuelbreaks to protect nearby communities from wildfire, salvage treatments to

                                          9

reduce fuel loads abutting private property, and snag removal to ensure safety for future fire-fighting and public access. (ECF No. 66-2 ¶ 2.) Moreover, the evidence states that the current injunction will prevent "important roadside hazard reductions" which would allow for the safe passage of fire suppression personnel and members of the public. (ECF No. 66-2 ¶ 13.)

Weighing these four factors, the Court finds that the factors tip in favor of Defendants. While Plaintiffs raised substantial questions regarding at least one of their claims, the Court must defer to the Forest Service's determination that without a stay the harm will become truly irreparable. The crux of this Court's first order was the fact that only Plaintiffs were in jeopardy of irreparable harm. In light of Federal Defendant's arguments in their newest motion, it is clear that Federal Defendants will face irreparable harm that — most critically in the Court's analysis — will threaten the public safety should the injunction remain in place. Accordingly, the Court must find in favor of Federal Defendants and stay the injunction pending appeal.

## IV. CONCLUSION

Accordingly, it is HEREBY ORDERED that Federal Defendants and Intervenor Defendant's Motions to Stay (ECF Nos. 64 and 66) are GRANTED. The Court's January 25, 2019 Order issuing a preliminary injunction (ECF No. 52) is STAYED pending appeal.

IT IS SO ORDERED.

Dated: May 31, 2019

_____
Troy L. Nunley
United States District Judge