1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11   KLAMATH-SISKIYOU WILDLANDS
     CENTER; ENVIRONMENTAL
12   PROTECTION INFORMATION                     No. 2:18-cv-02785-TLN-DMC
     CENTER; and KLAMATH FOREST
13   ALLIANCE,

14              Plaintiffs,                      **ORDER**

15       v.

16   PATRICIA A. GRANTHAM, Klamath
17   National Forest Supervisor, and UNITED
     STATES FOREST SERVICE,
18
                Defendants,
19
         and
20
     AMERICAN FOREST RESOURCE
21   COUNCIL, an Oregon non-profit
     corporation,
22
                Intervenor Defendant.
23

24

25        This matter is before the Court on three motions for summary judgment: (1) Klamath-

26   Siskiyou Wildlands Center's, Environmental Protection Information Center's, and Klamath

27   Forest Alliance's (collectively, "Plaintiffs") Motion for Summary Judgment (ECF No. 88); (2)

28   Patricia A. Grantham's and the United States Forest Service's (collectively, "Federal

                                              1

Defendants") Cross-Motion for Summary Judgment (ECF No. 91); and (3) American Forest Resource Council's ("Intervenor Defendant") Cross-Motion for Summary Judgment (ECF No. 92).[1]  For the reasons set forth below, the Court hereby GRANTS Federal Defendants' and Intervenor Defendant's cross-motions and DENIES Plaintiffs' motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Seiad-Horse Risk Reduction Project

Plaintiffs brought this action to challenge a post-wildfire logging and restoration project developed by Federal Defendants on the Klamath National Forest.  (ECF No. 1 at 2–3, 12.)  In 2017, the Abney fire began in southern Oregon before burning south, crossing the Oregon-California border, and burning approximately 10,800 acres in the Klamath National Forest. SHAR_A_0015.[2]  Much of the National Forest area affected by the Abney fire burned at high severity, killing nearly all the trees in the fire's path.  *Id.*  This severely burned area included portions of the National Forest designated as a late-successional reserve — a land use designation prioritizing conservation due to the presence of old-growth forest and old-growth forest dependent wildlife.  *Id.*; *see* SHAR_I_04400 (land allocations); *see generally Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125–26 (9th Cir. 2007) (discussing the land-management structure of the Northwest Forest Plan).

In the aftermath of the fire, Federal Defendants developed the Seiad-Horse Risk Reduction Project (the "Project") to "reduce safety hazards along roads and in concentrated stands,[3] reduce fuels adjacent to private property, reduce the risk of future large-scale high severity fire losses of late successional habitat, and place large woody debris in streams for fish

---

[1]      The Court will refer to Federal Defendants and Intervenor Defendant collectively as "Defendants."

[2]      These citations refer to the administrative record filed with the Court on March 25, 2019. (*See* ECF No. 59.) Citations to the administrative record will adopt the pagination used by the record.

[3]      "Stands" are groupings of trees of similar size, species, and stocking.  *See generally Cascadia Wildlands v. Bureau of Land Mgmt.*, No. 6:12-cv-00095-AA, 2012 WL 6738275 (D. Ore. Dec. 21, 2012) (adjudicating a challenge to a BLM method of calculating the age of stands under the Northwest Forest Plan).

and wildlife habitat restoration."  SHAR_A_00009.  The project area encompasses nearly 11,000

acres of National Forest land located within the Seiad Creek-Klamath River and Horse Creek-

Klamath river watersheds, including portions of the Johnny O'Neil late successional reserve.  *Id.*

at 00009, 00054, 00158.  Of several project alternatives proposed and considered, on September

28, 2018, Federal Defendants adopted "Alternative 2," which called for removing fire-killed and

damaged trees along roads, reducing fuels adjacent to private property, salvage harvesting fire-

killed and dying trees,[4] planting new trees, conducting low-intensity burning, developing

fuelbreaks, and creating fish habitat.  *Id.* at 00157.  Since the Project was adopted, all hazard tree

removal and post-fire salvage harvest authorized by the Project has either been completed or

terminated.  (ECF No. 91-2 ¶¶ 2–4; ECF No. 92-2 ¶¶ 2–5.)[5]

### B.   Statutory and Regulatory Framework

The National Forest Management Act ("Forest Act") requires the United States Forest

Service to develop and comply with forest plans for each unit of the National Forest System.  16

U.S.C. § 1604(a), (i).  "These plans operate like zoning ordinances, defining broadly the uses

allowed in various forest regions, setting goals and limits on various uses (from logging to road

construction), but do not directly compel specific actions . . . ."  *Citizens for Better Forestry v.*

*U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003).  The Forest Service developed the

Klamath National Forest Land and Resource Management Plan to govern agency actions on the

Klamath National Forest.  *See* SHAR_I_04106–04387.  Regionally, the Northwest Forest Plan

provides guidance for agency action on federal land throughout the range of the northern spotted

owl — that is, Washington, Oregon, and Northern California.  *See* SHAR_I_04388–04540.  The

---

[4]     "Salvage" is the removal of trees following a "stand-replacing event such as those caused by wind, fires, insect infestations, volcanic eruptions, or diseases."  SHAR_I_04450.

[5]     Plaintiffs do not object to the declaration of Defendant Patricia Grantham or the second declaration of Cade Crawford or provide evidence creating a genuine dispute as to whether more logging may occur under the Project.  The third declaration of George Sexton does not create a genuine dispute because it does not contain evidence the unlogged trees within the authorized units may be logged without a new agency decision.  (*See* ECF No. 93-1 ¶¶ 15–16; ECF No. 91-2 ¶¶ 2–4.)  In addition, Mr. Sexton's declaration only provides evidence of the Project's status on October 9, 2019.  (ECF No. 93-1 ¶ 15.)  Federal Defendants provide evidence the last logging activities were concluded in March 2020.  (ECF No. 91-2 ¶ 3.)

1    Aquatic Conservation Strategy is a component of the Northwest Forest Plan.  *See*

2    SHAR_I_04412–37.  The Klamath Forest Plan incorporates "[d]irection from the [Northwest

3    Forest Plan] for management of habitat for late-successional and old growth forest related

4    species."  SHAR_I_04121.  Forest plans are implemented through site-specific projects.  *Native*

5    *Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  The Forest Service's failure

6    to comply with the provisions of a forest plan is a violation of the Forest Act.  *Native Ecosystems*

7    *Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

8         The National Environmental Policy Act ("Environmental Policy Act") imposes procedural

9    requirements on federal agencies to consider the environmental impacts of their actions.  42

10   U.S.C. §§ 4321, 4331.  The purpose of the Environmental Policy Act is to ensure federal agencies

11   take a "hard look" at the consequences of their actions on the environment.  *Robertson v. Methow*

12   *Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).  It does not dictate the substantive results

13   of agency decision making.  *Id.* at 350.  Under the Environmental Policy Act, agencies must

14   prepare an environmental impact statement when a major federal action may significantly affect

15   the quality of the environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1).

16                    C.       Procedural History

17        Plaintiffs filed this action on October 16, 2018, alleging the portions of the Project

18   authorizing hazard tree removal and salvage logging did not comply with the Northwest Forest

19   Plan and alleging Federal Defendants violated the Environmental Policy Act by failing to prepare

20   an environmental impact statement before implementing the project.  (ECF No. 1; ECF No. 88 at

21   9.)  On December 5, 2018, the Court permitted Intervenor Defendant to intervene as a matter of

22   right pursuant to Federal Rule of Civil Procedure 24(a)(2).  (ECF No. 37.)  After a hearing on

23   January 10, 2019, the Court granted Plaintiffs' motion for a preliminary injunction on January 25,

24   2019, restraining Federal Defendants from implementing the logging portions of the Project.

25   (ECF No. 52.)  On May 31, 2019, the Court stayed the injunction pending Defendants'

26   interlocutory appeal of the Court's January 25, 2019 Order.  (ECF No. 74.)  The Ninth Circuit

27   Court of Appeals reversed the grant of the preliminary injunction on November 22, 2019.  (ECF

28   No. 82.)

1   Pursuant to the Court's December 9, 2019 Order, Plaintiffs filed their instant motion on

2   February 26, 2020.  (ECF No. 87.)  Pursuant to the Court's March 25, 2020 Order, Defendants

3   filed their instant cross-motions and oppositions to Plaintiffs' motion on April 10, 2020.  (ECF

4   Nos. 91, 92.)  Plaintiffs replied on May 8, 2020.  (ECF No. 93.)  Defendants replied on May 29,

5   2020.  (ECF Nos. 94, 95.)

6   **II.     STANDARD OF LAW**

7   Challenges to agency action under the Forest Act and Environmental Policy Act are

8   governed by the Administrative Procedure Act ("APA").  *Earth Island Inst. v. U.S. Forest Serv.*,

9   697 F.3d 1010, 1013 (9th Cir. 2012).  Under the APA, a court should only set aside agency action

10  if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

11  U.S.C. § 706(2)(A).  To determine whether the agency has made a "clear error of judgment" that

12  would render its action "arbitrary and capricious" the court must review the administrative record

13  the agency created to support its conclusions.  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th

14  Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555

15  U.S. 7 (2008).  An agency may not "rel[y] on factors which Congress has not intended it to

16  consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for

17  its decision that runs counter to the evidence before the agency, or [offer an explanation that] is so

18  implausible that it could not be ascribed to a difference in view or the product of agency

19  expertise."  *Id.* (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto Ins. Co.* ("*State*

20  *Farm*"), 463 U.S. 29, 43 (1983).  The standard is deferential, especially where a court is

21  reviewing an agency's predictive judgments about areas within the agency's field of expertise.

22  *Id.*  Further, while a court may not supply a rationale where an agency fails to do so, it should

23  "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

24  *State Farm*, 463 U.S. at 43.

25  Absent the errors in reasoning described above, the Forest Service's determination that a

26  particular project is consistent with the relevant plan "is accorded substantial deference" by a

27  reviewing court.  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).

28  Further, the Forest Service's interpretation of a provision of its own forest plan is entitled to *Auer*

5

1    deference where the provision being interpreted is ambiguous.  *Native Ecosystems Council v.*

2    *Marten*, 883 F.3d 783, 793 (9th Cir. 2018) (referring to the deference afforded to agency

3    interpretations of their own regulations articulated in *Auer v. Robbins*, 519 U.S. 452 (1997) and

4    further defined in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)).

5          "[S]ummary judgment is an appropriate mechanism for deciding the legal question of

6    whether the agency could reasonably have found the facts as it did."  *Occidental Eng'g Co. v.*

7    *INS*, 753 F.2d 766, 770 (9th Cir. 1985).  Review is generally "limited to the administrative record

8    on which the agency based the challenged decision."  *Fence Creek Cattle Co. v. U.S. Forest*

9    *Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

10         **III.    ANALYSIS**

11         Plaintiffs argue the Project violates: (1) the Forest Act because the Project does not

12   comply with the Aquatic Conservation Strategy or Northwest Forest Plan; and (2) the

13   Environmental Policy Act because the Federal Defendants did not prepare an environmental

14   impact statement.  (ECF No. 88 at 12–29.)  In their combined cross-motions and opposition briefs

15   to Plaintiffs' motion, Federal Defendants and Intervenor Defendant argue: (1) Plaintiffs claims

16   are moot because the challenged portions of the Project have been completed; (2) Plaintiffs do not

17   have standing to challenge the ongoing roadside hazard removal; and (3) the Project complied

18   with the Aquatic Conservation Strategy, Northwest Forest Plan, and Environmental Policy Act.

19   (ECF Nos. 91, 92.)  The Court will first determine whether it has jurisdiction over Plaintiffs'

20   claims before addressing each claim in turn.

21              A.    Jurisdiction

22                    i.    *Mootness*

23         Defendants argue Plaintiffs' action is moot because the logging activities Plaintiffs

24   challenge are complete or have been terminated.  As such, there is no controversy for the Court to

25   resolve, and it can provide no effective relief.  (ECF No. 91-1 at 12–13; ECF No. 92-1 at 11–14.)

26   In opposition, Plaintiffs argue: (1) their action is still live because there remain noncommercial

27

28

aspects of the project yet to be implemented; (2) Federal Defendants have not completed snag[6]
removal on 612 acres authorized under the plan; (3) the Court may order remedial and
prospective injunctive relief; and (4) Plaintiffs' request for declaratory relief remains active.
(ECF No. 93 at 7–10.)  In reply, Federal Defendants argue: (1) Plaintiffs may not expand their
challenge to include the noncommercial portions of the Project to evade mootness after expressly
limiting it to the salvage logging and roadside hazard treatment elements; (2) Defendant Patricia
Grantham's declaration establishes the 612 unlogged acres authorized under the Project will not
be logged, and, if they are, such action would require a separate authorization; (3) remedial and
prospective relief is inappropriate under the APA; and (4) Plaintiffs' claim for declaratory relief
does not establish a live controversy.  (ECF No. 94 at 6–10.)  Intervenor Defendant makes similar
arguments.  (*See* ECF No. 95 at 6–10.)

Federal courts do not have jurisdiction "to give opinions upon moot questions or abstract
propositions, or to declare principles or rules of law which cannot affect the matter in issue in the
case before [them]."  *Church of Scientology v. U.S.*, 506 U.S. 9, 12 (1992) (citation omitted).  In
deciding whether a case is moot in the context of a challenge to a federal agency's action
managing federal land "the question is not whether the precise relief sought at the time the
application for an injunction was filed is still available.  The question is whether there can be *any*
effective relief."  *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir. 1988).  The
party challenging the Court's jurisdiction bears the burden of demonstrating the absence of any
relief.  *S. Or. Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1134 (9th Cir. 2004).  The burden is
heavy, especially so in environmental actions.  *Cantrell v. City of Long Beach*, 241 F.3d 674, 678
(9th Cir. 2001) (referring to challenges to agency decision-making under the Environmental
Policy Act).

Plaintiffs' Environmental Policy Act claim is not moot because the Court could order
Federal Defendants to issue an environmental impact statement at any time.  *See Wild Wilderness
v. Allen*, 871 F.3d 719, 725 (9th Cir. 2017); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925

---

[6]    "Snags" are standing dead trees.  *See generally Brong*, 492 F.3d 1120 (adjudicating a
challenge to a BLM logging project's compliance with the Northwest Forest Plan).

1   (9th Cir. 2000).

2        Although judicial review under the APA is traditionally limited, *see Camp v. Pitts*, 411

3   U.S. 138, 143 (1973) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)), the Ninth Circuit has

4   reasoned that inadequate agency reasoning in a limited portion of an environmental management

5   decision can affect an agency's subsequent actions. *See, e.g.*, *Oregon Nat. Res. Council v. U.S.*

6   *Bureau of Land Mgmt.*, 470 F.3d 818, 821 (9th Cir. 2006) ("[T]he absence of [proper reasoning]

7   affected, or at least could have affected, not only the logging decision but also the post-logging

8   mitigation decision.  The absence of the appropriate 'hard look' analysis thus has present

9   consequences.").  Thus, where remedial action or mitigation measures are ongoing or possible,

10  even where the challenged action has been completed, federal courts retain jurisdiction. *See id*

11  (citing *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157–58 (9th Cir. 2006), *Neighbors*

12  *of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1066 (9th Cir. 2002)); *see also Northwest Envtl.*

13  *Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) ("The fact that the alleged violation has

14  itself ceased is not sufficient to render a case moot.  As long as effective relief may still be

15  available to counteract the effects of the violation, the controversy remains live and present.").

16  So long as the complaint makes "a broad request for such other relief as the court deemed

17  appropriate" and some effective relief exists, a court retains jurisdiction. *Neighbors of Cuddy*

18  *Mountain*, 303 F.3d at 1066 (discussing *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d

19  1012 (9th Cir. 1989)).

20       Here, Plaintiffs request the type of broad relief distinguished in *Headwaters* and discussed

21  in *Neighbors of Cuddy Mountain*.  In addition to declaratory relief, an injunction, and costs,

22  Plaintiffs included in their Complaint a request for "such other and further relief as the Court

23  deems just and equitable."  (ECF No. 1 at 20.)  Further, as in *Neighbors of Cuddy Mountain*,

24  remedies for the alleged harm of the timber sale remain available.

25          Although of course the logged trees cannot be brought back, the court
        . . . might order other measures to help mitigate the damage caused

26          by the sale.  For instance, it could order [Federal Defendants] to study
        the sale's impacts on species viability, and, if necessary, to mitigate

27          those impacts in both the area of the sale and elsewhere in the forest.
        If warranted, it might order [Federal Defendants] to adjust future

28          timber plans to compensate for this allegedly unlawful one.  Or, the

1
2
        remedy could take the form of a more direct species population intervention, such as monitoring the birds' population trends and developing, if necessary, artificial habitats for their recovery.

3

4   *Neighbors of Cuddy Mountain*, 303 F.3d at 1066 (citation omitted).

5       The Court sees no difference between binding precedent such as *Neighbors of Cuddy*

6 *Mountain* and Plaintiffs' action, and Defendants make no effort to distinguish such cases.

7 Therefore, the Court finds the case is not moot.

8               *ii.*    Standing

9       Intervenor Defendant argues Plaintiffs do not have standing to challenge roadside hazard

10 removal ongoing at the time the parties submitted briefing because Plaintiffs do not specifically

11 allege any harm from that element of the Project.  (ECF No. 92-1 at 13–14.)  Plaintiffs submit the

12 declarations of George Sexton, the Conservation Director for Plaintiff Klamath-Siskiyou

13 Wildlands Center; Kimberly Baker, a Public Land Advocate for Plaintiff Environmental

14 Protection Information Center; and Luke Ruediger, a landowner near the Klamath National Forest

15 and the Conservation Director for Plaintiff Klamath Forest Alliance's Siskiyou Field Office, to

16 establish standing.  (ECF Nos. 88-2, 88-3, 88-4; ECF No. 93 at 12 n.5.)  Plaintiffs do not provide

17 any argument on this issue.[7]

18       Plaintiffs must demonstrate standing to invoke federal jurisdiction.  *Lujan v. Defenders of*

19 *Wildlife*, 504 U.S. 555, 561 (1992).  Such a showing requires: (1) an injury in fact — "an invasion

20 of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent,

21 not conjectural or hypothetical"; (2) causation; and (3) a likelihood the injury will be redressed by

22

23
24
25
26
27
28
[7]     Both Plaintiffs and Federal Defendants briefly address standing in footnotes.  (ECF No. 91-1 at 12 n.2; ECF No. 93 at 12 n.5.)  "A footnote is the wrong place for substantive arguments on the merits of a motion."  *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 (N.D. Cal. 2008); *cf. Foti v. McHugh*, 247 Fed. Appx. 899, 901 n.2 (9th Cir. 2007) (holding a party waived an argument presented "[i]n a footnote to their counseled . . . brief"); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").  The Court's jurisdiction is not a tangential issue to be relegated to a footnote without substantive argument.  *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (referring to standing as an "irreducible constitutional minimum").

1   a favorable decision.  *Id.* at 560–61 (citations and internal quotation marks omitted).  Intervenor

2   Defendant challenges only the first element.  (ECF No. 92-1 at 13–14.)  "A plaintiff must

3   demonstrate standing for each claim he or she seeks to press and for each form of relief sought."

4   *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).

5          Mr. Sexton states in his declaration he enjoys visiting "naturally recovering post-fire

6   forests" on the Klamath National Forest, including the Project area.  (ECF No. 88-2 ¶¶ 13–15.)

7   Specifically, Mr. Sexton states he enjoys and values the "unique plant community" present in the

8   Project area.  (*Id.* at ¶¶ 27–29.)  Further, he writes articles for newspapers and newsletters about

9   such visits.  (*Id.* at ¶ 23.)  Ms. Baker states in her declaration she "obtain[s] personal and

10  professional enjoyment and fulfillment when visiting naturally recovering fire-affected forests

11  and watersheds on the Klamath National Forest that have not been impacted by industrial

12  logging," including the "yarding and hauling of trees."  (ECF No. 88-3 ¶ 9.)  Mr. Ruediger states

13  in his declaration he lives only five miles from the Project, writes and blogs about the area, and

14  leads educational hikes within the Project area.  (ECF No. 88-4 ¶¶ 1, 11, 12.)  Thus, Plaintiffs'

15  declarants have financial, recreational, and aesthetic interests in the ecological health of the

16  Project area.  Plaintiffs allege the roadside hazard treatments as well as the risk reduction salvage

17  will unlawfully worsen the ecological health of the Project area in several ways.  (ECF No. 1 ¶¶

18  80, 83, 85, 93–100, 117, 122.)  Therefore, to the extent Plaintiffs allege the hazard clearing

19  element of the Project contributes to a less healthy ecosystem within the Klamath National Forest,

20  Plaintiffs' declarants adequately demonstrate cognizable injury.

21                    B.      National Forest Management Act Claims

22                            i.      *Compliance with the Aquatic Conservation Strategy*

23          Plaintiffs argue the Project will increase sedimentation in the streams within the watershed

24  area contrary to Objectives 4, 5, and 6 of the Aquatic Conservation Strategy, a provision of the

25  Northwest Forest Plan, and therefore is a violation of the Forest Act.  (ECF No. 88 at 12–17.)  In

26  opposition, Defendants argue the Project complies with the Aquatic Conservation Strategy.

27  Federal Defendants argue the Project complies because Defendant Forest Service found its

28  cumulative effects would help restore the biological and physical processes and improve the

10

1    conditions of the watersheds within the Project area.  (ECF No. 91-1 at 13–18.)  Intervenor

2    Defendant argues Defendant Forest Service considered the short-term effects of the project and

3    the agency's interpretation of the Aquatic Conservation Strategy warrants deference; and the

4    Aquatic Conservation Strategy does not prohibit projects whose impacts fall outside the range of

5    natural variation.  (ECF No. 92-1 at 14–19.)

6            In reply, Plaintiffs claim Federal Defendants provide no authority for their conclusion the

7    Aquatic Conservation Strategy permits short-term detrimental effects in pursuit of long-term

8    compliance and argue the Project impermissibly relies on mitigation or planned restoration as a

9    substitute for preventing habitat degradation.  (ECF No. 93 at 12–15.)  Federal Defendants argue

10   the plain text of the Aquatic Conservation Strategy permits those projects that will either maintain

11   water quality or lead to improved quality in the long term, the project will improve the area

12   watersheds in the long term, and the latter contention merits deference.  (ECF No. 94 at 11–14.)

13   Finally, Intervenor Defendant argues the Court must defer to Defendant Forest Service's

14   judgments that the Project would only cause minor, temporary increases in sediment and that such

15   transitory increases comply with the Aquatic Conservation Strategy.  (ECF No. 95 at 12–14.)

16           The Aquatic Conservation Strategy "provide[s] guidance for situations not specifically

17   covered by the standards and guidelines [in the Northwest Forest Plan]."  SHAR_I_04404.  This

18   "clarification" is accomplished through the Aquatic Conservation Strategy "Objectives."  *Id.*  To

19   conclude a project complies with the objectives, "the [agency] analysis must include a description

20   of the existing condition, a description of the range of natural variability of the important physical

21   and biological components of a given watershed, and how the proposed project . . . maintains the

22   existing condition or moves it within the range of natural variability."  *Id.* at 04413.  Actions that

23   do not maintain the existing condition or lead to improved conditions in the long term should not

24   be implemented.  *Id.*  The Aquatic Conservation Strategy permits some logging.  *Id.* at 04411

25   ("Direct silvicultural management is appropriate following disturbances such as extensive, high-

26   severity fires.").  However, an agency may not use mitigation or restoration as a substitute for

27   preventing habitat degradation.  *Id.* at 04474.  Plaintiffs specifically argue the Project does not

28   comply with the objectives relating to water quality, sediment, and in-stream flows and uses the

1    ongoing restoration of "legacy treatment sites" to restore or mitigate degradation caused by the

2    Project.  (ECF No. 88 at 12–17.)[8]

3         The parties dispute whether the Aquatic Conservation Strategy permits short-term

4    degradation of water quality in pursuit of long-term restoration.  (ECF No. 88 at 15 (citing

5    SHAR_A_00098 (describing Project-related increased sediment delivery in the short term)); ECF

6    No. 91-1 at 15 (listing cases); ECF No. 92-1 at 15–16.)  Although agency analysis that does not

7    properly account for short-term, localized effects — in addition to long-term impacts — is

8    arbitrary and capricious, *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries

9    Serv.*, 265 F.3d 1028, 1036–37 (9th Cir. 2001), Plaintiffs have not provided any authority holding

10   short-term negative consequences of agency action necessarily violate the Aquatic Conservation

11   Strategy.  Rather, several district courts have held the "or" in "maintain the existing condition *or*

12   lead to improved conditions in the long term," SHAR_I_04413 (emphasis added), is disjunctive

13   — that is, it permits an agency to do either.  *See Bark v. Northrop*, 2016 WL 1181672, at *16–17

14   (D. Or. 2016) ("[T]he fact that the Project may cause short-term sediment impacts does not mean

15   that the Project will cause 'degradation.'  If that was the case, no agency action near Riparian

16   Reserves would ever be allowed."); *Conservation Cong. v. George*, No. 14-cv-1979-THE, 2015

17   WL 2157274, at *12 (N.D. Cal. May 7, 2015) (upholding project with minor, short-term negative

18   effects); *Klamath-Siskiyou Wildlands Ctr. v. Grantham*, No. 2:10-cv-02350-GEB-CMK, 2010

19   WL 3858640, at *5 (E.D. Cal. Oct. 8, 2010), *aff'd*, 424 Fed. Appx. 635 (9th Cir. 2011) (same);

20   *Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1234–35 (D. Or. 2009) ("Thus,

21   'evidence . . . that a project will result in some degradation does not, standing alone, constitute

22   

23   ――――――――――――――――――
     [8]    In full, the relevant objectives read as follows: "4. Maintain and restore water quality
24   necessary to support healthy riparian, aquatic, and wetland ecosystems.  Water quality must
     remain within the range that maintains the biological, physical, and chemical integrity of the
25   system and benefits survival, growth, reproduction, and migration of individuals composing
     aquatic and riparian communities.  5. Maintain and restore the sediment regime under which
26   aquatic ecosystems evolved.  Elements of the sediment regime include the timing, volume, rate,
     and character of sediment input, storage, and transport.  6. Maintain and restore in-stream flows
27   sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of
     sediment, nutrient, and wood routing.  The timing, magnitude, duration, and spatial distribution of
28   peak, high, and low flows must be protected."  SHAR_I_04414.

1  [Aquatic Conservation Strategy] noncompliance.'") (quoting *Pac. Coast Fed'n of Fishermen's*

2  *Ass'ns v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 2d 1063, 1070 (W.D. Wa. 1999), *aff'd in part*

3  *and vacated in part*, 265 F.3d 1028 (9th Cir. 2001)).

4       However, the same provision of the Aquatic Conservation Strategy may be read to require

5  *both* maintenance of current conditions *and* improved conditions in the long term — that is, "or"

6  could be read conjunctively.  Although the disjunctive use of "or" is the more typical, here, in a

7  guidance document the purpose of which is to "maintain and restore ecosystem health," the

8  conjunctive use is plausible.  SHAR_I_04412; *see U.S. v. Moore*, 613 F.2d 1029, 1040 (D.C. Cir.

9  1979) (interpreting "or" in a statute).  On the other hand, as the Oregon district court in *Bark v.*

10  *Northrop* reasoned, such a stringent interpretation would hobble all agency activity near streams

11  and rivers.  2016 WL 1181672, at *16–17.  In the face of such ambiguity, the Court must defer to

12  Defendant Forest Service's "fair and considered judgment" so long as it is not a "convenient

13  litigating position" or "*post hoc* rationalizatio[n]."  *Kisor*, 139 S. Ct. at 2417 (quoting *Christopher*

14  *v. SmtihKline Beecham Corp.*, 567 U.S. 142, 155 (2012)); *see also Native Ecosystems Council v.*

15  *Weldon*, 697 F.3d 1043 (9th Cir. 2012) ("While [the Forest Act] requires that the proposed site-

16  specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation

17  and implementation of its own forest plan is entitled to substantial deference.").

18       In analyzing the alternatives, Defendant Forest Service clearly read the Aquatic

19  Conservation Strategy to permit short-term negative impacts in pursuit of long-term

20  improvements.  For example, Appendix C to the environmental assessment published on

21  September 28, 2018, explained the Project would comply with the Aquatic Conservation

22  Strategy:

23              because: (1) while water temperature may be increased in the short
             term at the site scale, stream shading will be improved by riparian
24            planting in the long term; and (2) while turbidity will be increased in
             the short term and at the site scale during legacy sediment site
25            treatment and large wood placement it will be improved drastically
             by these treatments in the long term.
26

27  SHAR_A_00148; *see also id.* at 00119, 00146–49; SHAR_B_00027, 00060–62.  Therefore, the

28  Court will defer to Defendant Forest Service's interpretation of its own forest plan.  *See Oregon*

13

1   *Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("[O]ur circuit's

2   caselaw establishes that we give the Forest Service ample latitude in ensuring the consistency of

3   its actions with Forest Plans.").

4          The Aquatic Conservation Strategy provides agencies a second level of discretion in

5   addition to permitting short-term negative impacts.  Actions may be considered to "maintain the

6   existing condition" so long as they do not move the conditions of the watershed outside "the

7   range of natural variability of its important physical and biological components."

8   SHAR_I_04413.  However, the agency must articulate the current condition of the watershed, its

9   natural fluctuation, and describe how its proposed actions fall within that range.  *Id.*  Defendant

10  Forest Service generally described the current condition of the watershed in Appendix C to the

11  environmental assessment and did so in detail elsewhere, in relevant part:

12              All streams in the project area are listed as impaired under section
                303(d) of the Clean Water Act, which means that current conditions
13              do not meet water quality standards and streams are not supporting
                their beneficial uses.  The 303(d) list identified stream temperature
14              and sediment as the pollutants causing impairment.  One cause of
                impairment on National Forest System lands has been attributed to
15              legacy sediment sites from past management including historic
                mining, road building, and silviculture.

16

17  SHAR_A_00148; *see also id* at 00146; *id* at 00085–90 (detailed discussion of modeling results of

    no action alternative).  Similarly, Defendant Forest Service notes the range of natural variation in
18
    its analysis of Aquatic Conservation Strategy compliance and elsewhere, in relevant part:
19

20              Historically, in the range of natural variability, before European
                contact water temperature and turbidity would fluctuate in response
21              to wildfires, landslide events, and other stochastic events.  Wildfires
                would reduce shading to streams until canopy cover over streams
22              recovered.   Landslide events would widen and shallow stream
                channels, and remove riparian vegetation shading streams, resulting
23              in greater rate of stream heating and cooling.  Landslide events would
                cause acute bouts of turbidity that would generally be short in
24              duration.

25  *Id* at 00147; *see also id.* at 00142–44, 00145–47, 00148, 00149, 00150–51; *id.* at 00091–92 ("The

26  natural range of variability for watersheds in the Seiad-Horse Project include increased erosion

27  due to wildfire, and high intensity storm events.  Post fire soils are more susceptible to wind

28  erosion, rain events, abrupt snowmelt (rain on snow), and even dry ravel caused by gravity.").

1   Finally, Defendant Forest Service describes how the environmental consequences of Alternative 2

2   (the alternative ultimately adopted) fall within the range of natural variability of the Seiad-Horse

3   watersheds for water quality, sedimentation, and stream flows.  *Id.* at 00091–92 (sediment); *id* at

4   00119 (water quality for fauna and sediment); *id* at 00149 (in-stream flows); SHAR_B_00061–62

5   (water quality for fauna).[9]

6        Therefore, Defendant Forest Service adequately explained how the Project complied with

7   Aquatic Conservation Strategy objectives 4, 5, and 6.  Federal Defendants' expert judgment that

8   the Project complies with the Aquatic Conservation Strategy is entitled to deference so long as it

9   is adequately explained.  *See* SHAR_A_00167 (explaining compliance); *Oregon Nat. Desert*

10  *Ass'n*, 957 F.3d at 1035; *League of Wilderness Defenders Blue Mountains Biodiversity Project v.*

11  *Allen*, 615 F.3d 1122, 1134 (9th Cir. 2010) (deferring to the Forest Service's determination of

12  how best to fulfill Northwest Forest Plan objectives).  Therefore, the Project complied with the

13  Aquatic Conservation Strategy and the Forest Act.  Accordingly, the Court does not reach

14  Plaintiffs' argument regarding the impermissible use of restoration and mitigation as an

15  alternative for avoiding habitat degradation.

16                *ii.*     *Snag Retention under the Northwest Forest Plan*

17       Plaintiffs argue the Project does not comply with the Northwest Forest Plan's guidelines

18  on snag retention because the Project removed snags likely to persist before late-successional

19  conditions developed.  (ECF No. 88 at 17–20.)  In opposition, Defendants argue the Northwest

20  Forest Plan does not prohibit the removal of large diameter snags from late successional reserves

21  and the Project complied with the guidance of the applicable forest plans.  (ECF No. 91-1 at 18–

22  ───────────────
    [9]      The Court recognizes it reached the opposite conclusion in its May 31, 2019 Order

23  granting a stay of the preliminary injunction.  (ECF No. 74 at 5.)  However, upon review of the
    administrative record, and with the benefit of the extensive briefing on the instant motions, the

24  Court recognizes Defendant Forest Service's failure to include the words "range of natural
    variability" in the appropriately titled section of the analysis is not dispositive of compliance with

25  the Aquatic Conservation Strategy.  (*But see id.*)  Further, the portions quoted in the Court's prior
    Order clearly support each other.  For example, the historical fluctuations in shading described as

26  the range of natural variation support an inference of short-term loss of stream shading caused by
    the Project which falls within that natural range.  (*See id*); SHAR_A_00147–48.  Although the

27  analysis is "of less than ideal clarity," the Court can follow Defendant Forest Service's reasoning.

28  *State Farm*, 463 U.S. at 43.

23; ECF No. 92-1 at 19–28.)  In addition, Intervenor Defendant argues *Brong*, on which

Plaintiffs' argument relies, has been substantially undermined such that it is no longer controlling.

(ECF No. 92-1 at 21–23.)

In reply, Plaintiff argues the Project impermissibly retained only some snags, a subset of

those likely to persist until new large snags can form.  (ECF No. 93 at 15–20.)  Federal

Defendants argue the Northwest Forest Plan explicitly encourages active forest management to

reduce wildfire hazard, including salvage logging, and the Project retained an appropriate number

of snags.  (ECF No. 94 at 15–17.)  Intervenor Defendant makes similar arguments.  (ECF No. 95

at 12–15.)

The Klamath Forest Plan and the Northwest Forest Plan provide guidelines for salvage

within late successional reserves.  SHAR_I_02293, 04450–53.  The Northwest Forest Plan

explicitly encourages silvicultural activities aimed at reducing the risk of future stand-replacing

events, including salvage.  *Id.* at 04449–51; *id.* at SHAR_I_04450 ("Salvage guidelines are

intended to prevent negative effects on late-successional habitat, while permitting some

commercial wood volume removal.  In some cases, salvage operations may actually facilitate

habitat recovery. . . . [S]alvage may help reduce the risk of future stand-replacing disturbances.").

However, both plans provide guidance specific to salvage projects, limiting agency discretion in

developing such operations.  Forest-wide, the Klamath National Forest Plan advises agencies to

measure snag retention over a hundred-acre area while "[p]rovid[ing] for an average of 5 snags

per acre," not necessarily equally distributed, "[r]etain[ing] snags . . . in clumps when possible,"

and "[r]etain[ing] snags with the largest [diameter at breast height] as they tend to last longer and

make the best wildlife habitat."  SHAR_I_02236.  Guidelines specific to late successional

reserves provide additional guidance.  "Snags provide a variety of habitat benefits for a variety of

wildlife species associated with late-successional forests.  Accordingly, following stand-replacing

disturbance, management should focus on retaining snags that are likely to persist until late-

successional conditions have developed and the new stand is again producing large snags."

SHAR_I_02293.  Salvage that does not meet this and other guidelines is permitted when

"essential to reduce the future risk of fire . . . damage to late-successional forest conditions."  *Id.*

16

1    The late-successional reserve specific guidelines in the Klamath Forest Plan are drawn from the

2    Northwest Forest Plan.  SHAR_I_04450–53.

3           Plaintiffs rely on *Oregon Nat. Res. Council Fund. v. Brong* for the proposition that *any*

4    logging of snags likely to stand until the forest produces new snags is a violation of the Northwest

5    Forest Plan's guidance to *focus on* retaining such snags.  (ECF No. 88 at 17–18.)  This reading of

6    *Brong* is inconsistent with the guidance in aforementioned forest plans and recent Ninth Circuit

7    precedent.  First, as just summarized, the Northwest Forest Plan and the Klamath Forest Plan

8    permit logging in late successional reserves and the removal of snags.  SHAR_I_02236, 04449–

9    53.  The Ninth Circuit recognized this in *Brong* itself.  "[U]nder certain limited circumstances,

10   salvage can occur in [late successional reserves] . . . ."  *Brong*, 492 F.3d at 1130; *see also id* at

11   1129 n.13 ("[W]e do not divine an express limitation on removing large snags.") (internal

12   quotation marks omitted).  Further, the guidance advises agencies merely to focus on a specific

13   class of snags — those likely to remain standing until new snags form.  SHAR_I_02293.  Neither

14   forest plan contains mandatory language requiring the retention of all such snags.  *See Cascadia*

15   *Wildlands Project v. Goodman*, 393 F. Supp. 2d 1041, 1049 (D. Or. 2004) ("The court does not

16   read the guidelines to require the Service to retain all snags likely to persist until the return of

17   late-successional conditions and natural large snag recruitment.").

18          More importantly, the Ninth Circuit has upheld projects proposing salvage logging in late

19   successional reserves under the Northwest Forest Plan after *Brong* was decided.  *See, e.g.*, *Allen*,

20   615 F.3d at 1131 ("Far from conflicting with the protection of [late successional reserves],

21   carefully controlled logging is a tool expressly authorized by the [Northwest Forest Plan] for

22   long-term [late successional reserve] maintenance."); *Karuk Tribe v. Steele*, 671 Fed. Appx. 507,

23   509 (9th Cir. 2016) (distinguishing *Brong*).  In *Steele*, the Ninth Circuit explained the *Brong* court

24   "affirmed the entry of an injunction to prevent snag removal by means of clear cutting on a large

25   scale and undertaken for governmental profit."  671 Fed. Appx. at 509.  However, so long as the

26   agency's "motives are to prevent the danger of future fires, not economic gain, and the

27   government has gone to pains to avoid the risks of large-scale clear cutting envisioned in *Brong*"

28   salvage could be permissible under the Northwest Forest Plan.  *Id.*; *see also Brong*, 492 F.3d at

17

1   1127 (concluding BLM's balancing environmental concerns and economic factors equally was

2   inconsistent with the Northwest Forest Plan and, therefore, not entitled to deference).

3         Here, Federal Defendants' motives were primarily environmental rather than economic.

4   The environmental assessment begins by proposing the Project to "reduce safety hazards along

5   roads and in concentrated stands, reduce fuels adjacent to private property, reduce the risk of

6   future large-scale high severity fire losses of late successional habitat," and create fish habitat.

7   SHAR_A_00009.  All the "needs" identified in the environmental assessment relate to safety,

8   fuels reduction, or habitat restoration.  *Id.* at 00009–10.  In the Decision Notice, Defendant

9   Patricia Grantham expresses concern about the impact of increased severity fires on the Klamath

10   National Forest absent risk reduction.

11           Part of my consideration is the understanding of what will happen

12   should risk reduction treatments not be undertaken.  Analysis shows that about 60 percent of the project area will be subject to high fire intensity in the future under this scenario, a marked expansion of the

13   high severity impacts created by 2017's Abney Fire.  This is attributed to trees killed by the Abney Fire, left unabated, weakening

14   and falling to the ground over time, mixing with re-sprouting shrubs, hardwoods, grasses and small naturally reseeded trees, to create a

15   fuel load that will reburn at high severity when fire returns.  The resultant high severity burn will not only remove any slowly

16   reestablishing forest, but has the high potential to convert the area to a non-forested brush field condition for a long term period.  This

17   scenario does not contribute to meeting the objectives of the [late successional reserve].  Adopting a no action and no treatment

18   approach has serious implications regarding the health and sustainability of [late successional reserve] lands into the future.

19

20   SHAR_A_00159.  Any consideration of economic factors was related to the feasibility of the

21   Project, as the Decision Notice acknowledges.  *Id.* at 00162 ("To be clear, the desire to implement

22   while the dead and dying trees still have some economic value is not motivated by a need for

23   profit; it is the difference between the agency needing to use scarce public funds to pay for hazard

24   trees to be cut and removed and fuels to be reduced versus the possibility that the same dead and

25   dying trees could be purchased, cut, and removed as part of an economically viable timber sale to

26   achieve the purpose and need for the project.").  Federal Defendants did not impermissibly

27   "substitute economic interests for the paramount goal of preserving late-successional

28   ecosystems."  *Brong*, 492 F.3d at 1129 n.13; *see also Allen*, 615 F.3d at 1126 n.1; *Siskiyou Reg'l*

1    *Educ. Project v. Goodman*, 219 Fed. Appx. 692, 695 (9th Cir. 2007) ("The fact that there may be

2    some incidental economic benefit from the recovery project's sale of burned trees is not contrary

3    to and does not overshadow the [Northwest Forest Plan's] primary goals of forest protection and

4    restoration.").[10]

5        The Project does not resemble the type of clear cutting prohibited by *Brong*.  There, the

6    Ninth Circuit took issue with BLM's attempt to comply with the snag retention guidelines by

7    averaging the number of snags to be retained over the *entire* project area (approximately 1,000

8    acres) and only retaining snags outside the areas where logging would take place.  492 F.3d at

9    1129.  In contrast, here, the Project measured snag retention based on only 100-acre units rather

10    than the entire project area.  SHAR_A_00018.  In other words, the Project's snag retention

11    modeling was 100 times more detailed than that prohibited in *Brong*.  *Id.*; 492 F.3d at 1129.

12    Further, the Project retained all snags in riparian reserves and created "designated snag retention

13    areas" to ensure retained snags were grouped together, as required by the forest plan.  *Id.*;

14    SHAR_I_02236.  Individual snags within harvest areas were retained if they had high quality

15    habitat characteristics or were very large and likely to persist until the next stand produced large

16    snags.  SHAR_A_00018.  The result, according to Defendant Forest Service's models, was an

17    "average number of snags equal to or greater than 12 inches in diameter at breast height [of]

18    1,369 snags per 100 acres" or, in other words, approximately "14 conifer snags ranging in size

19    from 12 to over 46 inches in diameter at breast height" per acre.  SHAR_B_00944.  Therefore,

20    despite Plaintiffs' contention to the contrary, this case does not involve the "exact same situation

21    as *Brong*."  (ECF No. 88 at 19.)[11]

22        Other than their reliance on *Brong*, Plaintiffs provide no other explanation as to why the

23

24    ────────────────

[10]      The Court's analysis of this issue in its January 25, 2019 Order granting Plaintiffs' motion

25    for preliminary injunction assumed *any* consideration of economic practicalities ran afoul of

26    *Brong*.  (*See* ECF No. 52 at 11–12.)  As discussed here, *Brong* does not create such a stringent limitation on agency reasoning and none exists in the Northwest Forest Plan or Klamath Forest Plan.

27

28    [11]      Accordingly, the Court does not need to consider whether *Brong* is irreconcilable with *Allen* and *Oregon Nat. Desert Ass'n* as Defendants contend.

1    reasoning just described is arbitrary and capricious, and the Court sees none.  Further, assuming

2    for the sake of argument the foregoing analysis is incorrect, Plaintiffs do not attempt to explain

3    why the Project does not fall within the exception to the forest plan guidelines on salvage.

4    SHAR_I_02293 (salvage that does not meet the guidelines is permitted when "essential to reduce

5    the future risk of fire . . . damage to late-successional forest conditions."); SHAR_A_00159

6    (explaining the fire risks to the reserve without salvage).  Accordingly, Federal Defendants'

7    conclusion the snag retention complies with the applicable forest plans is subject to deference.

8    SHAR_A_00167 (explaining compliance); SHAR_I_00946–47 (same); *see Oregon Nat. Desert*

9    *Ass'n*, 957 F.3d at 1035; *Allen*, 615 F.3d at 1134.

10              *iii.*      *Habitat Suitability under the Northwest Forest Plan*

11            Plaintiffs' last Forest Act argument is that the Project does not comply with the Northwest

12   Forest Plan's guidance on maintaining habitat suitability.  (ECF No. 88 at 20–23.)  Specifically,

13   Plaintiffs argue: (1) the Project will diminish habitat suitability for species such as the fisher,

14   marten, goshawk, wolverine, great gray owl, and northern spotted owl; and (2) the forest-wide

15   snag retention guidelines do not apply to these species.  (*Id.*)  In their cross-motion, Federal

16   Defendants argue: (1) the Project exceeds the numerical minimum standards in the Klamath

17   Forest Plan, which are designed to benefit the species Plaintiffs' care about; (2) "habitat

18   suitability" means "late successional forest habitat," which the Project does not remove or alter;

19   and (3) reading the Northwest Forest Plan to forbid any degradation of any aspect of any species'

20   habitat would preclude any salvage harvest, despite the forest plan's explicit allowance for such

21   harvests.  (ECF No. 91 at 19–25.)  Intervenor Defendant notes Defendant Forest Service

22   estimated the impacts of the Project on northern spotted owl habitat would be insignificant.  (ECF

23   No. 92-1 at 26–28.)  In reply, Plaintiffs contend Federal Defendants' argument that the snag

24   retention numbers established for woodpeckers ensure quality environment for all other species is

25   simply wrong or at least is unsupported and that the Project worsened wildlife habitat conditions.

26   (ECF No. 93 at 15–20.)  Defendants reiterate the arguments from their cross-motions.  (ECF No.

27   94 at 17 –19; ECF No. 95 at 14.)

28            In addition to the guidelines outlined in Section III.B.*ii*, above, the Northwest Forest Plan

20

1    directs agencies to preserve habitat suitability in conducting salvage operations:

2              Salvage guidelines are intended to prevent negative effects on late-
               successional habitat, while permitting some commercial wood
3              volume removal.  In some cases, salvage operations may actually
               facilitate habitat recovery. For example, . . . salvage may help reduce
4              the risk of future stand-replacing disturbances. While priority should
               be given to salvage in areas where it will have a positive effect on
5              late-successional forest habitat, salvage operations should not
               diminish habitat suitability now or in the future.
6
     SHAR_I_04450.  Plaintiffs argue the Project "diminish[ed] habitat suitability" and therefore did
7
     not comply with the forest plan guidelines and the Forest Act.  The glaring problem with this
8
     argument is that no party provides the Court a definition of "diminish" or "habitat suitability"
9
     supported by the administrative record.  Plaintiffs contend "'habitat suitability' is a term of art"
10
     the forest plans use to describe the need to retain sufficient wildlife habitat during salvage.  (ECF
11
     No. 88 at 20 (citing SHAR_I_04451–52).)  The cited portion of the record does not support
12
     Plaintiffs' assertion.  The closest the Northwest Forest Plan gets to defining "habitat suitability"
13
     within the citation provided by Plaintiffs is as follows:
14
               Because Late-Successional Reserves have been established to
15             provide high quality habitat for species associated with late-
               successional forest conditions, management following a stand-
16             replacing event should be designed to accelerate or not impede the
               development of those conditions.  The rate of development of this
17             habitat will vary among provinces and forest types and will be
               influenced by a complex interaction of stand-level factors that
18             include site productivity, population dynamics of live trees and
               snags, and decay rates of coarse woody debris.  Because there is
19             much to learn about the development of species associated with these
               forests and their habitat, it seems prudent to only allow removal of
20             conservative quantities of salvage material from Late-Successional
               Reserves and retain management opportunities until the process is
21             better understood.

22   SHAR_I_04451.  This does not provide a clear standard by which the Court may review Federal
23
     Defendants' compliance with the forest plans and does not even mention the phrase "habitat
24
     suitability."  In the specific guidelines for snag retention that follow, the Northwest Forest Plan
25
     notes the importance of snags to wildlife but does not provide any further definition.  *See id.* at
26
     04451–52.
27
             Federal Defendants' definition of "habitat suitability" is similarly unavailing.  Federal
28

                                              21

1   Defendants argue "habitat suitability" refers only to late successional or old-growth habitat.

2   (ECF No. 91-1 at 23–24.)  Therefore, Federal Defendants reason, since the Abney fire burned

3   away all the old-growth habitat in the Project area and the Project only removed dead or dying

4   trees, the Project did not diminish habitat suitability.  (*Id.*)  However, the instruction not to

5   diminish habitat suitability in the Northwest Forest Plan refers to salvage operations, which only

6   remove dead trees (not old growth) and take place in areas where entire stands have been

7   destroyed.  *See* SHAR_I_04450–51.  Presumably, salvage after stand-replacing events would

8   rarely if ever impact old-growth forests, rendering the guidance at issue here nonsensical if the

9   Court were to employ Federal Defendants' definition of "habitat suitability."

10          Further, no party attempts to define "diminish."  The definition of "diminish" is important

11  because the forest plans and the administrative record use several terms to describe agency

12  impacts to habitat, each with their own meaning, including "degrade" and "degradation,"

13  "downgrade," and "removal."  *See* SHAR_B_00934 (defining "degrade"); *id.* at 01086 (defining

14  "downgrade" and "removal"); *see also Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048,

15  1052 (9th Cir. 2013) (defining all three).  Thus, "diminish" could plausibly mean reduced quality

16  (i.e., "degrade" or "downgrade") or reduced quantity (i.e., "removal").  Given the Northwest

17  Forest Plan's acknowledgement that permissible management to reduce fire risks "may reduce the

18  quality of habitat for late-successional organisms," the quantity definition seems correct.

19  SHAR_I_04411; *see Allen*, 615 F.3d at 1133.

20          Regardless, the snag retention standards articulated in the Klamath Forest Plan are

21  intended to provide sufficient snags for many wildlife species — not simply the "primary cavity-

22  association species" listed — and the Court sees no reason to question Defendant Forest Service's

23  expert determination.  As the Court noted, the Klamath Forest Plan developed species

24  assemblages to measure the need for certain habitat elements.  (ECF No. 52 at 11–12; ECF No.

25  74 at 6–7.)  The Klamath Forest Plan describes these "management indicator species" as

26  representative of the habitat needs for a certain element (here, snags) of all wildlife species.

27  SHAR_I_04158 ("Monitoring several species, with similar or overlapping habitat needs, will

28  provide a better reflection of the range of responses by all wildlife species associated with a given

22

1   habitat or habitat element.").  The "multi-species assemblage" chosen to represent wildlife needs

2   for snags were seven species of birds, mostly woodpeckers.  *Id.* at 04159.  The Klamath Forest

3   Plan directs the Forest Service to use the "snag association assemblage" of birds to "assess . . .

4   project-level impacts to habitat conditions."  *Id.* at 04210; *see also* SHAR_B_00942 ("The

5   Species Associations identified in the Forest Plan under the Management Indicator Species

6   sections was developed to represent habitats or features important for many plant and animal

7   species.  Snags are an important feature so a series of Snag Associated Species were identified to

8   represent the snag feature in different but sometimes overlapping habitat types as a measure of

9   potential effects of passive and active land management.").  The forest plan provides a table with

10  the type, size, and density of snags averaged over 100 acres necessary to support the snag

11  association assemblage and, therefore, other wildlife.  *Id.*

12       The Project provides more snags for wildlife than is required by the Klamath Forest Plan.

13  SHAR_B_00944–47.  Even so, Defendant Forest Service extensively evaluated the impact of the

14  Project on each of the species Plaintiffs express concern for, ultimately concluding the Project

15  complied with the relevant forest plans.  *See* SHAR_A_00120–21 (northern spotted owl); *id.* at

16  00125–27 (northern goshawk, great gray owl, wolverine, fisher); SHAR_B_01058 (goshawk); *id.*

17  at 01059 (fisher, martin, wolverine); *id.* at 01063, 01066 (great gray owl); *id.* at 01082–89

18  (northern spotted owl); *see also* SHAR_G_00269 ("Treatment in these areas would remove . . .

19  non habitat.").

20       "In sum, the record shows that [Federal Defendants] have ensured compliance with the

21  [Northwest Forest Plan], basing the . . . [P]roject on a thorough consideration of the relevant

22  factors."  *Siskiyou Reg'l Educ. Project v. Goodman*, 219 Fed. Appx. at 696 (citing *Citizens to*

23  *Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)); *Ocean Advocates v. U.S. Army*

24  *Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005)).  To the extent the Project adversely affected

25  any wildlife, Federal Defendants' balancing of the competing objectives of fire prevention and

26  habitat preservation is reasonable, especially in light of the indefinite standard to which Plaintiffs

27  seek to hold Federal Defendants.  *See id.*; *Cascadia Wildland Project v. Goodman*, 393 F. Supp.

28  2d at 1049–50.  Plaintiffs fail to convince the Court it should not defer to Federal Defendants'

1   expert determination the Project left an appropriate number of snags to provide for the habitat

2   needs of wildlife.  *See* SHAR_A_00167 (explaining compliance); *Oregon Nat. Desert Ass'n*, 957

3   F.3d at 1035; *Allen*, 615 F.3d at 1134.[12]  Therefore, Federal Defendants did not violate the Forest

4   Act by implementing the Project.

5                     C.        National Environmental Policy Act Claim

6          Plaintiffs argue Federal Defendants violated the Environmental Policy Act because they

7   did not produce an environmental impact statement.  (ECF No. 88 at 23–29.)  In their cross-

8   motions, Defendants argue an environmental impact statement was not required under the

9   Environmental Policy Act because Federal Defendants reasonably determined the Project would

10  not have a significant impact.  (ECF No. 91-1 at 25–31; ECF No. 92-1 at 28–32.)  In reply, all

11  three parties reiterate the arguments from their cross-motions.  (*See* ECF No. 93 at 20–21; ECF

12  No. 94 at 19–20; ECF No. 95 at 15.)

13         The Environmental Policy Act requires federal agencies to prepare an environmental

14  impact statement when it proposes a major federal action that may significantly affect the quality

15  of the environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1).  To determine whether a

16  proposed project is "significant[]," an agency must examine the content and intensity of the

17  project.  40 C.F.R. § 1508.27; *Wild Wilderness v. Allen*, 871 F.3d 719, 729 (9th Cir. 2017).

18  Plaintiffs argue the following regulatory factors indicate an environmental impact statement was

19  necessary: (1) the unique characteristics of the geographic area, such as proximity to ecologically

20  critical areas; (2) the cumulative significance of the proposed project and other actions; (3)

21  whether the action threatens a violation of law.  (ECF No. 88 at 23–24 (citing 40 C.F.R. §§

22  1508.27(b)(3), (b)(7), (b)(10)).)  A single factor may trigger the need for an environmental impact

23  statement, *Ocean Advocates*, 361 F.3d at 1124–25, but merely limited negative effects of a

24  project on one of the factors does not necessarily mean the factor favors an environmental impact

25  statement, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

26  
27  _____

[12]      The Court's prior Orders reaching the opposite conclusion did so without the current
briefing and as such, did not understand the role of the management indicator species as a
measurement tool for the habitat needs of all wildlife.  (*See* ECF No. 52 at 11–12; ECF No. 74 at
28  6–7.)

1    If an agency determines a proposed project does not require an environmental impact

2    statement, it must issue a "finding of no significant impact."  40 C.F.R. § 1501.4(e).  The finding

3    must explain why an environmental impact statement is not necessary.  40 C.F.R. § 1508.13.

4    Federal Defendants issued a finding of no significant impact along with the final environmental

5    assessment on September 28, 2018.  SHAR_A_00109–28.

6    Plaintiffs' arguments as to factors 2 and 3 are derivative of its Forest Act claims.  (*See*

7    ECF No. 88 at 28–29; ECF No. 93 at 20–21.)  Accordingly, as the Court has already determined

8    those claims fail, it finds factors 2 and 3 weigh in Federal Defendants' favor.  *See generally*

9    SHAR_A_00116–18 (explaining why the cumulative impacts are not significant); *id.* at 00122–28

10   (explaining why the Project does not threaten a violation of law).

11   Plaintiffs contend the proximity of the Project to the Johnny O'Neil Late-Successional

12   Reserve, Essential Habitat Connectivity area, Kangaroo Inventoried Roadless Area, and Pacific

13   Crest Trail necessitate an environmental impact statement.  (ECF No. 88 at 24–28.)  Plaintiffs'

14   argument regarding the Johnny O'Neil Late-Successional Reserve is the same as its arguments for

15   violations of the Forest Act, which the Court has already rejected in Sections III.B.*ii–iii*.  (*Id.* at

16   24.)

17   Plaintiffs argue, and the environmental assessment acknowledges, the Project area

18   contains portions of the Essential Habitat Connectivity area identified by the California Essential

19   Habitat Connectivity Project in 2010.  SHAR_A_00103; (ECF No. 88 at 24–26.)  However, the

20   environmental analysis explains both the California Essential Habitat Connectivity Project and a

21   study conducted in 2011 designated the area important to wildlife connectivity over a large scale

22   and did not "provide the detail needed to determine the change in connectivity at a smaller scale"

23   such as that of the Project.  SHAR_A_00103.  The environmental analysis instead used "habitat

24   connectivity for the fisher, marten, and wolverine as analysis indicators because these species,

25   and the resulting analysis, are more sensitive to the possible effects resulting from the proposed

26   actions."  *Id.*  The analysis concluded the Project would reduce the habitat connectivity levels for

27   three watersheds.  *Id.* at 00104; SHAR_B_01051.  However, the existing conditions in those

28   watersheds were "already very close to the lower habitat connectivity level and the actions in [the

25

1   Project] simply tip these habitat connectivity levels" from one level to the next.

2   SHAR_A_00104; SHAR_B_01059.  Therefore, Defendant Forest Service concluded the change

3   in connectivity would be small and insignificant and the Project would result in improved habitat

4   connectivity relatively quickly.  SHAR_A_00104; SHAR_B_01059.  Although Plaintiffs

5   vehemently disagree with Defendant Forest Service's analysis (*see* ECF No. 88 at 26), the Court

6   must defer to the reasoned scientific conclusions of expert agencies.  *See Bark v. Northrop*, 607

7   Fed. Appx. 652, 655 (9th Cir. 2015).

8          Plaintiffs next argue the roadside hazard removal along the two miles of Forest Road

9   47N80 that travels through the Kangaroo Inventoried Roadless Area necessitates an

10  environmental impact statement.  (ECF No. 88 at 26–28.)  The Klamath Forest Plan requires

11  Defendant Forest Service to maintain roads used for trailhead access to accommodate recreation

12  users, and Forest Road 47N80 is regularly used to access the Pacific Crest Trail and Seiad Creek

13  Trail.  SHAR_A_00099.  Thus, "[r]oad maintenance is clearly appropriate" and does not

14  "significantly impact roadless character."  *Id.*  Plaintiffs' citations to *Lands Council v. Martin*,

15  *Smith v. U.S. Forest Serv.*, and *Cascadia Wildlands v. U.S. Forest Serv.*, are inapposite because

16  each discuss the impact of logging on the "roadless character" of areas without roads.  *See Lands*

17  *Council v. Martin*, 529 F.3d 1219, 1230–32 (9th Cir. 2008); *Smith v. U.S. Forest Serv.*, 33 F.3d

18  1072, 1078 (9th Cir. 1994); *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1281

19  (D. Or. 2013).  Here, the only salvage will take place along a small section of the already-

20  established road, and the Project will not create any new roads in the area.  SHAR_A_00099–

21  00100.  Therefore, it is unclear how this action will in any way alter the area's roadless character.

22  *See Umpqua Watersheds v. U.S.*, 725 F. Supp. 2d 1232, 1241–42 (D. Or. 2010) (holding Forest

23  Service reasonably concluded no environmental impact statement was required where no new

24  roads were built).  Accordingly, Federal Defendants' determination that the impact of the hazard

25  removal on the Kangaroo Inventoried Roadless Area is insignificant is reasonable.

26         Lastly, Plaintiffs argue the logging activities disrupt the view from the Pacific Crest Trail

27  and this fact was not discussed in the finding of no significant impact.  (ECF No. 88 at 28.)  To

28  the contrary, Federal Defendants developed an alternative to examine views from the Pacific

Crest Trail in detail.  SHAR_A_00105–09, 00113.  As a result, "[t]he [P]roject was designed to minimize potential unnatural appearances to meet the retention visual quality objective until vegetive regrowth in three to ten years and to mitigate scenic effects of potential hazard tree removal in the area adjacent to the Pacific Crest Trail . . . ."  *Id.* at 00113.  The discussion of the Project's impact on the view from the Pacific Crest Trail and the adaptation of the Project to mitigate the significance of that impact is sufficient for the purposes of the Environmental Policy Act.  *See Klamath-Siskiyou Wildlands Center v. Grantham*, No. 2:10-CV-02350-GEB-CMK, 2010 WL 4137351, at *5 (E.D. Cal. Oct. 19, 2010) (environmental impact statement not required where "the Project's Environmental Assessment analyzed the anticipated effects on scenery and recreation, and found neither would be significantly affected.").

None of the challenged factors weigh in Plaintiffs' favor.  Therefore, the Court finds Federal Defendants did not violate the Environmental Policy Act by issuing a finding of no significant impact rather than an environmental impact statement.

**IV.   CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS Federal Defendants' and Intervenor Defendant's Cross-Motions for Summary Judgment (ECF Nos. 91, 92) and DENIES Plaintiffs' Motion for Summary Judgment (ECF No. 88).  The Clerk of Court is directed to enter judgment in favor of Defendants and Intervenor Defendant and close the case.

IT IS SO ORDERED.

DATED:  February 7, 2022

Troy L. Nunley
United States District Judge

27